EPOCH PRODUCING CORPORATION, Plaintiff-Appellee and Cross-Appellant,

v.

KILLIAM SHOWS, INC., et al., Defendants-Appellants and Cross-Appellees.

KILLIAM SHOWS, INC., et al., Third-Party Plaintiffs-Appellants,

v.

Raymond ROHAUER and Jay Ward Productions, Inc., Third-Party Defendants-Appellees.

Nos. 246, 247, 390, Dockets 73–2795, 74–1269, 74–1425.

United States Court of Appeals, Second Circuit.

Argued May 2, 1975.

Decided Aug. 13, 1975.

---

Jeffrey Squires, Washington, D. C., Peter Jaszi, Chevy Chase, Md. (Goldfarb & Singer, Washington, D. C., Edward A. Sargoy, New York City, of counsel), for defendants-appellants, cross-appellees, and third-party plaintiffs-appellants.

Louis Jobrack, New York City (Isadore B. Hurwitz, New York City, of counsel), for plaintiff-appellee and cross-appellant and third-party appellees.

Gerald Meyer, New York City (Phillips, Nizer, Benjamin, Krim & Ballon, New York City, Melville B. Nimmer, Kaplan, Livingston, Goodwin, Berkowitz & Selvin, Beverly Hills, Cal., of counsel), for amicus curiae Columbia Pictures Industries, Inc., and others.

Before MOORE and MANSFIELD, Circuit Judges, and HOLDEN, District Judge.*

MANSFIELD, Circuit Judge:

The central issue presented by this appeal is the validity of a renewal copyright in D. W. Griffith's famous film classic The Birth of a Nation ("The Birth"), which was a pioneer in the field of full-length feature motion pictures. The renewal was issued in 1942 by the Copyright Office to Epoch Producing Corporation ("Epoch"), which in 1969 brought suit in the Southern District of New York for infringement against Killiam Shows, Inc., Gregstan Enterprises and Paul Killiam, defendants and third-party plaintiffs (collectively referred to herein as "Killiam"), and against Movielab, Inc. Killiam answered, contending that under the law governing copyright renewal, 17 U.S.C. § 24,[1] Epoch had no legal right to the renewal and that the motion picture passed into the public domain at the expiration of the original 28-year copyright term for lack of a valid renewal application.

* Chief Judge of the United States District Court for the District of Vermont, sitting by designation.

1. Title 17 U.S.C. § 24 provides:

"Duration; renewal and extension

"The copyright secured by this title shall endure for twenty-eight years from the date of first publication, whether the copyrighted work bears the author's true name or is published anonymously or under an assumed

A jury trial before Charles L. Brieant, Jr., *Judge,* resulted in special verdicts upholding the validity of the renewal and finding that Killiam had infringed it. Killiam appeals from orders assessing damages for infringement and dismissing Killiam's third-party complaint against Raymond Rohauer and Jay Ward Productions, Inc., charging a conspiracy to breach an alleged contractual obligation by Rohauer to refrain from claiming any copyright interest in The Birth and to assist Killiam in improving Killiam's alleged copyright in the motion picture. We hold that since the evidence introduced at trial permitted but one reasonable conclusion, namely, that Epoch had failed to sustain its burden of establishing the validity of its renewal copyright, it was error not to have directed a verdict in favor of Killiam on Epoch's claim. The dismissal of Killiam's third-party complaint for failure to state a cause of action is affirmed.

The numerous issues raised by the parties on this appeal require an understanding of the circumstances surrounding the production of The Birth and negotiations with respect to copyright interests in it. Because of the passage of some 60 years since the picture was made and 32 years since the renewal copyright was issued, the parties have been relegated for the most part to reliance upon contemporaneous documentary proof. Though this evidence leaves substantial gaps, it does establish certain facts. The records of the Copyright Office, corroborated in part by live testimony and by other documentary proof, confirm that in 1914 David W. Griffith produced The Birth. The scenario, written by Griffith and Frank E. Woods, was based upon the novel "The Clansman" written by Thomas Dixon, copyrighted in 1904. Griffith was both the producer and director of the motion picture.

Griffith's role as producer and director of The Birth is evidenced by the first copyright application concerning the film, dated February 6, 1915, which was filed on February 13, 1915, in the name of the David W. Griffith Corporation ("DWG Corp."), a company controlled by Griffith. It applied for a copyright in The Birth as a motion-picture photoplay not reproduced for sale; in other words, as an unpublished work. A Certificate of Copyright Registration, issued to the DWG Corp. on February 13, 1915, states that the film was adapted from Thomas Dixon's novel and produced by D. W. Griffith, with story arrangement by D. W. Griffith and Frank E. Woods. The completed film was first publicly exhibited at Clune's Auditorium in Los Angeles on February 8, 1915, bearing copyright notice in the name of the DWG Corp.[2]

name: *Provided,* That in the case of any posthumous work or of any periodical, cyclopedic, or other composite work upon which the copyright was originally secured by the proprietor thereof, or of any work copyrighted by a corporate body (otherwise than as assignee or licensee of the individual author) or by an employer for whom such work is made for hire, the proprietor of such copyright shall be entitled to a renewal and extension of the copyright in such work for the further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright: *And provided further,* That in the case of any other copyrighted work, including a contribution by an individual author to a periodical or to a cyclopedic or other composite work, the author of such work, if still living, or the widow, widower, or children of the author, if the author be not living, or if such author, widow, widower, or children be not living, then the author's executors, or in the absence of a will, his next of kin shall be entitled to a renewal and extension of the copyright in such work for a further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright: *And provided further,* That in default of the registration of such application for renewal and extension, the copyright in any work shall determine at the expiration of twenty-eight years from first publication."

2. Statutory copyright in a published work is acquired through publication of the work with the notice of copyright prescribed by Title 17 affixed thereto. 17 U.S.C. § 10. All subsequent published copies of the work must also have the copyright notice affixed thereto. *Id.* Registration of the copyright in a published

The copyrights for both the published and unpublished works were assigned by the DWG Corp. to Epoch and to Thomas Dixon by two instruments dated April 17, 1915. The assignment of the copyright in the unpublished work, filed with the Copyright Office on May 15, 1915, was signed by David W. Griffith as president of DWG Corp. It assigned "all its right, title and interest" in DWG Corp.'s copyright in the film, which was described as a copyright "for the term of twenty-eight years." The assignment of the copyright in the published work, filed with the Copyright Office on February 25, 1916, was signed by Albert H. T. Banzhaf as treasurer of DWG Corp. It conveyed all of DWG Corp.'s interest in "the copyright acquired by it by public presentation of the motion picture photoplay" with notice of copyright and authorized the assignees to apply for a Certificate of Copyright Registration.

Epoch and Dixon applied for registration of the copyright in the published work on October 1, 1915. A Certificate of Copyright was duly issued in their names, which recites that the film was produced under the direction of David W. Griffith, based on Thomas Dixon's novel, with scenario by D. W. Griffith and Frank E. Woods. The term of this statutory copyright was 28 years from February 8, 1915.

The foregoing evidence of D. W. Griffith's creation of The Birth was corroborated by testimony of two witnesses who were present at the making of The Birth. Lillian Gish and Joseph Henaberry, who played roles in the picture, testified to Griffith's having been in charge of direction and production. Although Dixon was the author of the book upon which The Birth was based, there was no evidence that anyone other than Griffith and Woods wrote the screen photoplay

or that anyone other than Griffith produced the motion picture.

On June 22, 1942, Epoch applied to the Copyright Office for a renewal copyright in The Birth, describing itself as both the "author," original claimant, and "the proprietor of copyright in a work made for hire." The term "author" is defined in the Copyright Act to include, "an employer in the case of works made for hire," 17 U.S.C. § 26. D. W. Griffith was listed as the director of the film and, along with Frank E. Woods, as author of the scenario. Thus Griffith was represented to be the employee who made the work for hire and Epoch as the "author," or his employer. A renewal certificate was issued by the Copyright Office in the name of Epoch as "the proprietor in a work made for hire." No other person or entity has ever applied for or received a renewal copyright in the film.[3]

In support of its characterization of the film as a "work made for hire," Epoch introduced into evidence at trial several agreements involving the proposed production of a film based on Thomas Dixon's novel. The earliest of these agreements, dated December 20, 1913, which was before The Birth was made or first publicly exhibited, was between Dixon and Majestic Motion Picture Company. It granted to Majestic the "sole and exclusive right" to produce, license and exhibit a motion picture based upon Dixon's novel "The Clansman" and upon a dramatic version of the novel written by Dixon. The film was to be completed by July 1, 1914. Majestic was apparently unable to meet its obligations under this contract as a later agreement was entered into by Majestic and Dixon, dated June 9, 1914, extending the date for completion of the film to October 1, 1914, and changing the financial ar-

work is thus not necessary to acquire the copyright, but is simply a recordation of it. Under 17 U.S.C. § 13, however, registration and deposit of copies of the work with the Copyright Office are conditions precedent to the bringing of an infringement action under Title 17. As a practical matter registration is necessary for full copyright protection.

3. Although the 28-year renewal period was to expire in 1971, Congress has enacted special legislation periodically for the past 13 years which has had the effect of extending renewal copyrights, under the most recent enactment, through December 31, 1976. See, e. g., Pub.L. 93–573, Title I, § 104, 88 Stat. 1873 (1974).

rangements between the parties. There is no evidence, however, that Majestic participated in the making of The Birth or that it hired Griffith or anyone else to do so.

Epoch was not formed until February 6, 1915, which was after The Birth had been made. Its Certificate of Incorporation was filed in New York State on February 8, 1915, the date of the first public exhibition of The Birth in Los Angeles. Majestic had until this time apparently been unable to fulfill its obligations to Dixon. Epoch assumed those obligations in an agreement dated June 14, 1915. Dixon released Majestic from its obligations, which were increased from $75,000 to $110,000, and accepted Epoch in its place.[4] The two corporations, Majestic and Epoch, appear to have been closely related, since Harry E. Aitken was president of both. Their familiarity to D. W. Griffith is confirmed by Albert H. T. Banzhaf's status as treasurer of both Epoch and DWG Corp. However, there is no evidence of any employer-employee relationship between Majestic or Epoch, on the one hand, and D. W. Griffith, on the other. There is no contract of employment, record of salary payments, or proof that Majestic or Epoch supervised or controlled Griffith in the making of the picture.

The present suit by Epoch for infringement of its renewal copyright has its genesis in the acquisition, by means of a quitclaim deed, by Killiam Shows, Inc., in 1959 of any interest owned by the estate of D. W. Griffith in the right to a statutory renewal copyright in The Birth and in other films. Killiam has distributed The Birth to theatrical and television outlets from 1959 to the present.[5] This distribution is claimed by Epoch to have infringed its renewal copyright.

## DISCUSSION

■ Of the various claims of error asserted by Killiam on this appeal, we turn first to the failure of the district court to grant Killiam's motion for a directed verdict since our disposition of that issue renders it unnecessary to consider some of the other grounds urged for reversal. First, a few words must be said about the standard by which we are governed in reviewing a district court's denial of a motion for a directed verdict or a motion for judgment notwithstanding the verdict. Our standard is the same as that which governs the trial court. The evidence must be "such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict," *Brady v. Southern Ry. Co.,* 320 U.S. 476, 479, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943). See *Urti v. Transport Commercial Corp.,* 479 F.2d 766, 768–69 (5th Cir. 1973); *O'Connor v. Pennsylvania Railroad Co.,* 308 F.2d 911, 914 (2d Cir. 1962).

"If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the mo-

---

4. We are left to speculate why, The Birth having been produced and exhibited, Epoch and Majestic agreed to increase the amount of the obligations "as yet unperformed" by Majestic, which were assumed by Epoch. One possibility is that Majestic had intended to reimburse D. W. Griffith for sums already expended in the production of the picture. Another is that Majestic had already advanced monies to Griffith, which would leave unexplained the parties' use of the term "as yet unperformed." One could conjure up other possible reasons but we are in any event left without any evi-

dence as to what part, if any, Majestic or Epoch played in the making of the film.

5. On this appeal Killiam has abandoned its claim made below that the purchase by Killiam Shows, Inc. of all copyright interest in The Birth owned by the estate of David W. Griffith passed a real interest in the renewal copyright. Rather, it now asserts only that Epoch's renewal copyright is invalid and that therefore the work in question has passed into the public domain.

tions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury." *Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir. 1969).

To ascertain whether this standard was properly applied by the trial court we must "examine the entire record to determine whether there were any jury questions," *Stief v. J. A. Sexauer Manufacturing Co.,* 380 F.2d 453, 455 (2d Cir.), *cert. denied,* 389 U.S. 897, 88 S.Ct. 220, 19 L.Ed.2d 216 (1967); see *Boeing Co. v. Shipman, supra,* 411 F.2d at 374–76; *O'Connor v. Pennsylvania Railroad Co., supra.* This we have done.

The acquisition of initial statutory term and renewal copyrights in the United States is governed exclusively by the Copyright Act of 1909, 35 Stat. 1075 (1909), amended and enacted into law as Title 17, United States Code. Under that statute the term of protection provided for a copyrightable work is divided into two separate time periods, each 28 years in length. The right to obtain the initial 28-year term is vested in "[t]he author or proprietor of any work made the subject of copyright by [Title 17]." 17 U.S.C. § 9. As one would expect, the person claiming this initial term must either himself be the author of the copyrightable work (i. e., either the individual creator or the employer in the case of works made for hire, 17 U.S.C. § 26) or he must have succeeded to the rights of the author through an assignment or other device. 1 M. Nimmer, Copyright § 60, at 233 (1974).

The right to the renewal term copyright is not so simply defined. The renewal term is not merely an extension of the initial-term copyright vesting in the current owner of the original term. Rather, it has been described as a "new grant," e. g., *G. Ricordi & Co. v. Paramount Pictures, Inc.,* 189 F.2d 469, 471 (2d Cir.), *cert. denied,* 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951); see *Fred Fisher Music Co. v. M. Witmark & Sons,* 318 U.S. 643, 63 S.Ct. 773, 87 L.Ed. 1055 (1943), which is "a separate interest distinct from the original copyright," *Edward B. Marks Music Corp. v. Charles K. Harris Music Pub. Co., Inc.,* 255 F.2d 518, 521 (2d Cir.), *cert. denied,* 358 U.S. 831, 79 S.Ct. 51, 3 L.Ed.2d 69 (1958). The right of renewal is determined exclusively by 17 U.S.C. § 24, reproduced in note 1, *supra,* which provides that the renewal may be obtained by

(1) the proprietor of the original term copyright, in the case of certain types of works, i. e., posthumous works, composite works originally copyrighted by the proprietor, works copyrighted originally by a corporate body other than as an assignee or licensee of the individual author, or works copyrighted by an employer for whom such work is made for hire; or

(2) the individual author if still living at the time of renewal in the case of all other copyrighted works or, if the individual author is not living, his widow, her widower, children of the author, or next of kin.

Bearing in mind these basic principles and that the burden was on Epoch to make a prima facie showing of validity of its renewal copyright, see *Houghton Mifflin Co. v. Stackpole Sons, Inc.,* 113 F.2d 627 (2d Cir. 1940); 2 M. Nimmer, Copyright § 141.1 (1974), we turn to an evaluation of the proof and theories put forth by Epoch.

GROUNDS ASSERTED BY EPOCH OR BY AMICI CURIAE FOR UPHOLDING VALIDITY OF RENEWAL COPYRIGHT IN "THE BIRTH OF A NATION"

1. *The Theory that Epoch and/or Majestic Was an Employer of Griffith for Hire.*

Epoch advances several theories upon which it argues that the jury could have upheld the validity of its renewal copyright. The first of these is the ground upon which it sought and obtained the Certificate of Renewal from the Copyright Office in 1942, i. e., that the work had originally been copyrighted by it in

1915 as "an employer for whom such work [was] made for hire," thus making it the "author" within the Copyright Act's definition, 17 U.S.C. § 26. In support of this theory it points (a) to the three agreements between Dixon, Majestic and Epoch, entered into on December 20, 1913, June 9, 1914, and June 14, 1915, respectively, (b) to the two copyright assignments from DWG Corp. to Epoch, dated April 17, 1915, and (c) to the Certificate of Renewal issued in 1942 by the Copyright Office to Epoch as "the proprietor of copyright in a work made for hire," which was uncontested by Griffith during his lifetime or by his next of kin since his death.

On the basis of these documents it contends that an inference may be drawn that Majestic and/or Epoch hired D. W. Griffith to produce The Birth and that Griffith recognized Epoch's primary right to the copyright in the film. We disagree.

 In our view this evidence is clearly insufficient to permit any jury reasonably to draw the inference urged by Epoch. An inference will be upheld only if application of common experience and logic to the underlying evidence will support it. See, e. g., *Bruce Lincoln-Mercury, Inc. v. Universal C. I. T. Credit Corp.,* 325 F.2d 2, 22 (3d Cir. 1963); *United States v. Patterson,* 219 F.2d 659, 661–62 (2d Cir. 1955). Here, even giving Epoch the benefit of every doubt, no such process is possible. To permit a finding that Griffith was employed for hire by Majestic or Epoch on the basis of the evidence relied upon by Epoch would be to substitute mere speculation for reason and experience. At most the evidence shows that Dixon assigned to Majestic the right to produce a motion picture based on his novel, that Majestic was to finance the production, and that Majestic may have financed Griffith's production of the film. Even this last step toward the inference sought by Epoch stretches the reasoning process to the breaking point, since there is no showing that Majestic and/or Epoch actually supervised or paid any money for

the making of the motion picture. Of importance to us, however, is the fact that the evidence sheds absolutely no light on the critical issue, which is what relationship, if any, existed between Griffith, on the one hand, and Majestic or Epoch, on the other. The evidence relied upon by Epoch does not, for instance, indicate whether Majestic and/or Epoch simply supplied capital for the production of the picture, whether they commissioned Griffith independently to produce the film, whether they "hired" Griffith as employee to do the work and, most important, whether they could have exercised the requisite power to control or supervise Griffith's work, which is the hallmark of "an employment for hire" relationship, *Picture Music, Inc. v. Bourne, Inc.,* 457 F.2d 1213, 1216–17 (2d Cir.), *cert. denied,* 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972); *Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc.,* 375 F.2d 639 (2d Cir. 1967), *cert. denied,* 389 U.S. 1036, 88 S.Ct. 768, 19 L.Ed.2d 823 (1968). Epoch's argument that the absence of provisions in these contracts relating to Griffith's employment simply indicates that he, as a mere employee, had not been hired yet is wholly unsupported by any facts. In short, the evidence does not permit an inference that Epoch or Majestic employed Griffith for hire to make the motion picture.

Nor may an inference that Griffith was employed by Majestic or Epoch be drawn from the fact that DWG Corp. assigned its rights in the initial copyright to Epoch and to Dixon. Viewed most favorably to Epoch, the assignments merely evidenced a transfer of interest, which might have been motivated by a number of considerations unconnected in any way with an employer-employee relationship. One might speculate, for instance, that Griffith transferred the copyrights in recognition of past financing of his independent production of The Birth or in anticipation of a future relationship with Epoch. Absent some evidence of an employer-employee relationship, the existence of evidence

that is as consistent with such a relationship as it is with numerous other hypotheses, cannot be bootstrapped to remedy the basic deficiency which is the absence of any proof that Griffith was in fact hired by Majestic or Epoch to make the film. Cf. *Pennsylvania Railroad Co. v. Chamberlain,* 288 U.S. 333, 339–42, 53 S.Ct. 391, 77 L.Ed. 819 (1933).

The contention that Griffith may have been an employee for hire of Epoch is further belied by the fact that Epoch did not come into existence until February 8, 1915, which was after The Birth had been produced by Griffith. Indeed, February 8, 1915, was the very day on which the film was first publicly exhibited at Clune's Auditorium. These undisputed facts directly contradict Epoch's representations in its application for renewal copyright in 1942 that it was the "author" (i. e., employer for whom the work was made for hire) of the film.

Any contention that DWG Corp., the only other possibility, was the employer of Griffith must be discarded for similar reasons. Evidence produced at trial by defendant Killiam, and uncontradicted by plaintiff, conclusively proved that DWG Corp. was essentially an inactive shell corporation in 1914 and 1915, the years during which the film was created. Its financial records for those years, including its federal income tax returns, show no expenditures for the production of any motion pictures. It engaged in no business at all in 1914 and obtained some slight income in 1915, mostly from motion picture rentals. Under these circumstances it could not have been an employer for whom the film was made for hire.

2. *The Theory that Epoch's Certificate of Copyright Renewal Registration Creates a Presumption of Validity.*

Having failed to point to evidence on the record from which a jury could reasonably conclude that The Birth was made by D. W. Griffith in the employment of another party, Epoch argues, pursuant to 17 U.S.C. § 209, that the Certificate of Copyright Renewal that it

obtained in 1942 was prima facie proof of the facts stated therein and of the validity of the renewal copyright. Further, it contends that the passage of time without challenge to the renewal adds significant support to its validity. Both of these contentions must be rejected.

■ Title 17 U.S.C. § 209 does create a presumption of validity with respect to a certificate of initial copyright registration, stating that it "shall be admitted in any court as prima facie evidence of the facts stated therein." It is clear from the construction of § 209, however, that the presumption was meant to attach only to *original* certificates. All of § 209 is concerned with the contents of the original certificate of registration, the information that must be supplied by the original claimant and various other mechanics of the original registration procedure. No reference at all is made to the requirements of renewal applications and certificates. In this context the reference to "[s]aid certificate" in regard to the presumption can only refer to the *original* registration certificate.

■■ Additionally, the minimal verification of the information supplied in connection with an application for an original copyright certificate is wholly absent in the case of a renewal application. The Copyright Office directs in its regulations that the application for original registration accurately reflect "the facts existing at the time of first publication." 37 C.F.R. § 202.3(b)(3). No such admonition is applied to applications for renewal copyright. Indeed, the Copyright Office will accept and register more than one claim to the renewal copyright in a particular work, even if the claims are in obvious conflict. B. Ringer, *Renewal of Copyright,* in *Report of the Register of Copyrights on the Revision of the U. S. Copyright Law, Study No. 31,* at 107, 184 (1960) (hereinafter cited as "Ringer"). The Office will point out the conflict to the later applicant and request confirmation of the later claim, but does not view its function as making "judicial determinations of sub-

stantive renewal rights" and will register the conflicting claim of a determined applicant. *Id.* This drastic diversity in the treatment of original and renewal applications confirms our interpretation of § 209. Congress surely did not intend that such great weight attach to renewal certificates issued to all claimants regardless of questions concerning validity.[6]

Finally, even assuming that some presumption of validity might attach to Epoch's renewal certificate, at least where 27 years passed without challenge, that presumption would certainly be dissipated, as in the case of the § 209 presumption, see, e. g., *Lauratex Textile Corp. v. Citation Fabrics Corp.,* 328 F.Supp. 554, 555 (S.D.N.Y.1971); *United Merchants and Manufacturers, Inc. v. Sarne Co., Inc.,* 278 F.Supp. 162, 164 (S.D.N.Y.1967), by proof that material statements in the certificate were false. As outlined above, the documentary evidence introduced at trial showed that Epoch could not have been the author of the film, even though this status was claimed in the renewal application and there is no proof that Majestic or DWG Corp. employed Griffith to make the motion picture for hire. Indeed, none of the evidence supports the assertion made in the renewal certificate that the film was made for hire, and much of it (including the documentary records regarding the original copyright) points to a contrary conclusion. In these circumstances, any evidentiary weight that the renewal certificate might otherwise have had is offset and the burden of proving the validity of its renewal is shifted back to Epoch, *Gardenia Flowers, Inc. v. Joseph Markovits, Inc.,* 280 F.Supp. 776, 780–81 (S.D.N.Y.1968). Epoch has failed to sustain that burden.

3. *The Theory that the 1915 Assignments Conveyed the Renewal Rights.*

Epoch's alternative ground upon which a jury might have upheld its renewal is based on the assignment of the original term copyright from DWG Corp. in 1915. As explained above, the copyright in both the published and unpublished versions of the film was originally secured by DWG Corp. and then assigned to Dixon and Epoch in instruments dated April 17, 1915. Relying mainly upon broad language found in each assignment, which purports to transfer to Epoch all of the rights in the copyright enjoyed by the assignor, DWG Corp., Epoch now argues that these assignments can be fairly construed to have conveyed to it the right to both the original term copyright and the renewal copyright in The Birth. We disagree.

The construction of the assignments urged by Epoch is not one that a jury could fairly adopt, given the record in this case.[7] While Epoch is correct that both assignments contain broad general language purporting to convey to Epoch all of the DWG Corp.'s interest in the film, that language is necessarily limited in its application by the specific description in each assignment of the interest

---

6. Only one of the parties, Epoch Producing, cites any case authority on this presumption issue. The one case cited by Epoch, *Rohauer v. Killiam Shows, Inc.,* 379 F.Supp. 723 (S.D.N.Y.1974), is unpersuasive. While the opinion does accord prima facie weight, pursuant to § 209, to a renewal copyright certificate, *id.* at 733–34, it does so without any consideration or analysis of the factors discussed in the text, which distinguish original and renewal applications. Moreover, it cites as authority for according such weight to renewal certificates only decisions which considered original copyright certificates. Furthermore, this decision was rendered in a case still pending in the Southern District of New York and has not yet been reviewed by this court.

7. In the construction of copyright assignments, as with contracts and other writings, the meaning to be placed on the words of the assignment ultimately turns upon the intention of the parties to the agreement. *Venus Music Corp. v. Mills Music, Inc.,* 261 F.2d 577 (2d Cir. 1958); *Rossiter v. Vogel,* 134 F.2d 908 (2d Cir. 1943). That intention is to be determined from the evidence submitted to the court, including the agreement itself, statements and actions of the parties contemporaneous with and following the agreement, oral testimony, affidavits, depositions, and other equally competent evidence. The only evidence as to the intent of the parties introduced in this case was the agreements themselves.

conveyed, see Corbin, Contracts §§ 547, 549 (1960). In both assignments the interest is clearly identified as the first 28-year term only. The assignment of the unpublished work specifically describes the copyright as one "for the term of twenty-eight years." The assignment of the published work conveyed "the copyright acquired by [DWG Corp.] by public presentation of the motion picture photoplay"; a clear reference to the initial 28-year term, since the renewal term is separate from the initial term and not acquired through publication with notice, see *Fred Fisher Music Co. v. M. Witmark & Sons, supra.*

■ Moreover, there is no specific reference in either assignment to the renewal term. This deficiency has generally been held as a matter of law, absent contrary evidence, to preclude a holding that a transfer of renewal rights was intended. "[A] general transfer by an author of the original copyright without mention of renewal rights conveys no interest in the renewal rights without proof of a contrary intention." *Edward B. Marks Music Corp. v. Charles K. Harris Music Pub. Co., supra,* 255 F.2d at 521; see, e. g., *G. Ricordi & Co. v. Paramount Pictures, Inc., supra,* 189 F.2d at 471. Epoch points to no evidence of a different intention in the present case.

■ While Epoch correctly observes that the assignment here is from a corporation and not from an individual author, we do not think that difference is critical here, where the corporation was controlled by the author. The policy behind the rule of construction restricting an assignment to the original term unless it refers to renewal rights is to protect authors from inadvertent transfers of renewal rights. That policy, it is

true, might not govern a transfer from a corporation unrelated to the author, see *Rohauer v. Friedman,* 306 F.2d 933, 935–36 (9th Cir. 1962). Here, however, DWG Corp. was in effect the author's alter ego. Epoch adduced no proof that DWG Corp. had any independent right (i. e., as purchaser for value or as employer for hire) to obtain the film copyrights. Thus DWG Corp. could only have obtained the copyright as the nominee or instrumentality of Griffith himself through assignment by Griffith of his common law copyright to the corporation, which need not have been in writing, cf. *Dave Grossman Designs, Inc. v. Bortin,* 347 F.Supp. 1150, 1154 (N.D.Ill.1972). The policy behind the rule of construction that favors the author's retention of renewal rights, therefore, is served by application of the rule in such a situation. The transfer from the DWG Corp. is analogous to a transfer from the individual author and the assignments should be construed in accordance with the rule of *Marks Music Corp.* Since there is no other proof of an intention to transfer renewal rights, the assignments must be limited in their effect to the original term copyright.[8]

### 4. The Theory that Epoch was Entitled to Renewal of the Work as One "Copyrighted by a Corporate Body."

Finally, *amici curiae* argue that Epoch's renewal copyright could have been upheld by the jury under the proviso of § 24 of the Copyright Act which gives to the original term copyright proprietor the right to the renewal copyright "of any work copyrighted by a corporate body (otherwise than as assignee or licensee of the individual author)." Starting with the undisputed fact that The Birth was copyrighted by a corporate body, DWG Corp., the contention is that

8. A further limitation on the interest conveyed by the copyright assignments from DWG Corp. to Epoch is Epoch's failure to introduce any evidence to prove that DWG Corp. in fact owned anything more than the initial 28-year copyright term. As explained in the text, since there was no proof that DWG Corp. had any right to apply for the copyright in its own name, it must have obtained the original copy-

right on the film with Griffith's permission as the assignee or licensee of Griffith's common law copyright. Such an assignment by the author of a work conveys only initial term copyright, reserving the renewal for the author himself. See *Austin v. Steiner,* 207 F.Supp. 776 (N.D.Ill.1962); 2 M. Nimmer, Copyright § 114.3, at 469 (1974).

it must have been an employer for hire and that Epoch, as its assignee, falls within the proviso.

██ This argument fails for several reasons. First, the assumption that D. W. Griffith made the film as an employee for hire is, as we have demonstrated, unsupported by any evidence. Epoch wholly failed to carry its burden of proving that D. W. Griffith was an employee for hire of DWG Corp. or anyone else. The evidence, on the contrary, demonstrated that he was the individual author of the film and that DWG Corp. could only have copyrighted the work as the licensee or assignee of his common law copyright, cf. *Dave Grossman Designs, Inc. v. Bortin, supra,* 347 F.Supp. at 1154. The clause cannot apply in these circumstances. *Donaldson Publishing Co. v. Bergman, Vocco & Conn, Inc., supra,* 375 F.2d at 643.

██ Furthermore, what authoritative commentary exists concerning the "corporate body" provision of § 24 indicates that it has no application to works of this type which are authored and produced by one identifiable person either as an employee for hire or as an independent author. See Ringer, *supra,* at 136–37. For instance, Judge Learned Hand in dictum interpreted the clause as applying only to works composed by persons related to a corporation, but not as employees for hire, assignors or licensors. *Shapiro, Bernstein & Co. v. Bryan,* 123 F.2d 697, 699 (2d Cir. 1941).[9] The only other interpretation of note would apply the clause only to works of an impersonal nature composed by a staff or others whose individual work is merged into the whole and incapable of separate identification. Ringer, *supra,* at 136.

In sum there was insufficient evidence introduced at trial from which the jury could reasonably find Epoch's renewal copyright valid under any of the theories advanced below and on this appeal. As Epoch was unable to produce even a prima facie case supporting the validity of its renewal copyright at trial, we hold that the district court should have granted Killiam's motion for a directed verdict. Our holding makes it unnecessary to resolve the many other issues raised by the parties, including (1) the contention that a renewal copyright may not be sought by the proprietor of an original copyright in a work made for hire unless the copyright was first obtained by the employer (as distinguished from an assignee), and (2) the errors claimed to have been committed by the trial judge in his instructions to the jury, in his exclusion of evidence bearing on the authorship of The Birth, in the special verdict questions put to the jury, and in his award of damages and attorneys' fees to Epoch.

## KILLIAM'S THIRD–PARTY ACTION AGAINST ROHAUER AND JAY WARD PRODUCTIONS, INC.

██ As to Killiam's third-party action alleging a conspiracy to breach a contractual obligation to protect and enhance its interest in the copyright, Killiam has now abandoned its claim that it ever owned an interest in The Birth. Since one suffers no loss from damage to property unless one possesses some interest in that property, Killiam suffered no damage from the alleged acts of the third-party defendants and the third-party complaint no longer states a cause of action, cf. *Rich v. New York Stock Exchange,* 522 F.2d 153, (2d Cir. 1975) (Feinberg, *J.,* concurring). Its dismissal by the district court will therefore be affirmed.

## CONCLUSION

The trial court erred in not directing a verdict to the effect that Epoch had failed to establish the validity of its renewal copyright and in not dismissing Epoch's complaint. Accordingly the judgment of the district court awarding

**9.** Conceivable examples of such works include (1) writings by members of a religious order, although not its employees, have no personal right in the work, and (2) writings for the corporation by a corporate official or major stockholder. Ringer, *supra,* at 137 n. 215.

damages and attorneys' fees to Epoch is reversed and the case is remanded with instructions to enter judgment dismissing Epoch's complaint.

Costs are awarded to Killiam against Epoch for costs incurred upon Killiam's appeal from the award of damages and equitable relief to Epoch and upon Epoch's cross-appeal with respect to relief. Each party will bear its own costs incurred with respect to the appeal on the third-party action.