**SCHMID BROTHERS, INC., Plaintiff,**

v.

**W. GOEBEL PORZELLANFABRIK KG. and Portfolio Press Corp., Defendants.**

**No. 77 C 1419.**

United States District Court, E.D. New York.

June 20, 1984.

Henry Herrmann, Boston, Mass., Wormser, Kiely, Alessandroni, Hyde & McCann, New York City (Lawrence McKenna, New York City, of counsel), for plaintiff.

Brumbaugh, Graves, Donohue & Raymond, New York City (Granville M. Brumbaugh, Richard G. Fuller, Jr., James N. Buckner, New York City, of counsel), for defendants.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiff Schmid Brothers, Inc. (Schmid), a Massachusetts corporation, invoking jurisdiction under 28 U.S.C. § 1332(a), seeks a judgment that it is co-proprietor of United States renewal copyrights in five works, two plaques and three figurines, allegedly co-authored by the well known artist, Sister Berta Hummel (Sister Hummel). Defendants are W. Goebel Porzellanfabrik K.G. (Goebel), a German limited partnership manufacturing and selling ceramic art works, and Portfolio Press Corp. (Portfolio), a book publisher. Portfolio is not now involved in the case.

By memorandum and order dated June 27, 1983, the court denied Goebel's motion pursuant to Rule 41(b) to dismiss Schmid's direct case. The parties submitted further evidence, and the case is ready for decision.

## I

The parties base their claims on Section 24 of the Copyright Act of 1909, formerly 17 U.S.C. § 24 (Section 24) and superseded by 1976 legislation. That section reads, in pertinent part, as follows:

> The copyright secured by this title shall endure for twenty-eight years from the date of first publication, whether the copyrighted work bears the author's true name or is published anonymously or under an assumed name: *Provided,* That in the case of ... any work copyrighted by a corporate body (otherwise than as assignee or licensee of the individual author) or by an employer for whom such work is made for hire, the proprietor of such copyright shall be entitled to a renewal and extension of the copyright in such work for the further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright: *And provided further,* That in the case of any other copyrighted work, ... the author of such work, if still living, or the widow, widower, or children of the author, if the author be not living, or if such author, widow, widower or children be not living, then the author's executors, or in the absence of a will, his next of kin shall be entitled to a renewal and extension of the copyright in such work for a further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright ....

Under Section 24 the initial term of copyright is twenty-eight years. The section grants the right to a "renewal and exten-

sion" of the copyright (if application is filed within a year prior to expiration of the initial term) to the persons and in the circumstances set forth in the section. Schmid claims as assignee of the mother and sole heir of Sister Hummel, allegedly co-author of the works. Goebel contends that Sister Hummel's mother had no renewal rights because, under the terms of Section 24, (a) Sister Hummel was not a co-author of the five works, (b) even if she was, the works were initially "copyrighted by" Sister Hummel's convent, "a corporate body (otherwise than as assignee or licensee of the individual author)," (c) even if Sister Hummel contributed to the works, the convent secured the original copyrights as "an employer" for which the works were "made for hire," and (d) Schmid is estopped by a 1974 German court decision.

Section 24 protects the heirs of an author from her improvident grant of renewal rights if she is not alive (as Sister Hummel was not) during the twenty-eighth year of the initial term. *See Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373, 375, 80 S.Ct. 792, 794, 4 L.Ed.2d 804 (1960); *Epoch Producing Corporation v. Killiam Shows, Inc.*, 522 F.2d 737, 747 (2d Cir. 1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976); *G. Ricordi & Co. v. Paramount Pictures, Inc.*, 189 F.2d 469, 471 (2d Cir.), *cert. denied*, 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951); *White-Smith Music Pub. Co. v. Goff*, 187 F. 247, 253 (1st Cir.1911).

Schmid denies Goebel's contentions and claims that Sister Hummel was co-author with Goebel of the works and that Goebel, when it obtained the renewals in 1966 and 1967, did so as trustee for Sister Hummel's mother, who thereby became joint proprietor of the renewal copyrights.

## II

Sister Hummel was born in 1909 in Bavaria, Germany, and died prematurely in 1946. In 1927 she entered the Munich Academy of Fine and Applied Arts and began her formal art training, thereafter doing creative work, including sketching, drawing and painting. She graduated in March 1931 and about a month later became a member of the Congregation of the School Sisterhood of the Third Order of St. Francis in Siessen (the Convent) in Wuerttemberg, Germany. For some two years she was a Candidate, for a year a Novice, and in August 1934 she became a Sister. The Convent assigned her to work in the Convent's Parament Department designing ecclesiastical vestments and artifacts. She also, but not as a part of the Parament Department, drew and painted secular subjects, and five of these drawings and sketches later became the basis for the five three dimensional works in issue.

On January 29, 1935 an agreement (plaintiff's Exhibit 12) was entered into reciting that it was "[b]etween the artist" Sister Hummel "as well as the Convent" on the one hand and Goebel on the other. The Convent is not mentioned in the body of the agreement.

Paragraph 1 provides that Sister Hummel "herewith transfers to" Goebel "the exclusive right to reproduce, in a plastic form, the works which she has created, as f.e. drawings, sketches, models etc.," that Goebel will manufacture the works out of porcelain or stone-ware, and that the "exclusive right in the manufacture shall equally apply to the painting of the articles as used or wished by" Sister Hummel.

Paragraph 2 provides that before sale of an article Goebel shall send "the respective model or the respective figurine" to Sister Hummel "to the end that the execution is approved of" by her. Paragraph 3 provides that Goebel shall pay to Sister Hummel a royalty of 5% of any item sold. Paragraph 4 provides that the agreement will be in force until the end of 1935, to be extended automatically for each calendar year unless notice of termination is given "by one of the parties" no later than September 30 of the respective year.

The agreement was signed by Goebel, Sister Hummel and the General Prioress of the Convent.

On November 18, 1935 a further agreement (plaintiff's Exhibit 14) was signed, stating that it was "[b]etween the artist" Sister Hummel "as well as the Convent" on the one hand and Goebel on the other. Again, the Convent is not named in the body of the agreement as the party transferring the right to manufacture or as having the right to approve the products of Goebel or to receive royalties. This agreement, signed by Goebel, Sister Hummel and Superior Dietrich, contains much the same provisions as the previous agreement, but provides for additional controls by Sister Hummel of the articles to be manufactured by Goebel. Under paragraph 1 Goebel is permitted to make those works "specified by her" and in sizes "inasmuch as" she "will give her consent thereto." Goebel may not make any article "similar to the Hummel-originals as to form or colour, or which remarkably leans upon the Hummel originals, without the consent of the artist," and the "same applies as to the painting of the articles."

Under paragraph 2 Goebel is to propose to Sister Hummel "which Hummel drawing" it intends "to manufacture in a plastic way" and the manner in which it "shall be executed." After obtaining her consent "on principle" to the manufacture of the plastic Goebel is to send the design "for judgment and rectification." Only after design has been approved by Sister Hummel may Goebel "go to work as regards the model." The finished model must then be "approved" by her "as to both its execution and its decoration."

By paragraph 6 Goebel obtains the rights to bring action "against third parties for infringement of the rights under this agreement," and Sister Hummel "will not be responsible for counsel's fees, or court fees, or any other expenses in case of legal proceedings."

A further agreement (plaintiff's Exhibit 18), dated August 15, 1939, is substantially the same as the previous agreement with the following pertinent differences. The "transfer" by Sister Hummel to Goebel of the right to reproduce her works in plastic form is made with "the full consent" of the Convent. The royalties to be paid to Sister Hummel are increased. Goebel is given the right to institute legal proceedings against third parties "for infringement of the rights resulting from this agreement, and of the copyrights of" Sister Hummel, and neither she nor the Convent is to be responsible for costs or expenses of such proceedings. In the case of Sister Hummel's death the Convent "only will assume the rights and obligations of the entire agreement."

On May 28, 1943 an agreement (plaintiff's Exhibit 20) was entered into, this time solely between Sister Hummel and Goebel. The Convent is not mentioned and is not a signatory. This agreement refers to the previous agreements as agreements "between" Sister Hummel "on one side" and Goebel "on the other side." The agreement refers to Goebel's right to institute infringement proceedings with respect to the "rights resulting from this agreement," as well as to "the copyrights" of Sister Hummel, and recites that "the above mentioned copyrights do not mean only the copyrights in the models" which Goebel may manufacture but "the copyrights of the artist," Sister Hummel, "in her entire works." Thus Goebel is entitled to bring proceedings for infringement of Sister Hummel's copyrights even if they "are infringed in another field as that of the plastic execution."

The original United States statutory copyrights in the five works, all showing secular scenes, were obtained by publishing the plaques in December 1938 and the figurines in March 1939 and registering all five works on August 16, 1939. Each registration certificate recites a brief description of the work and the fact that it was "by" Sister Hummel (plaintiff's Exhibits 1–10).

Although the United States copyrights were obtained in the name of Goebel, if Sister Hummel was a joint author of the works, Goebel held the copyrights as constructive trustee for her or her assignee. *Maurel v. Smith,* 220 F. 195, 201 (S.D.N.Y. 1915), *aff'd,* 271 F. 211 (2d Cir.1921).

As noted, Goebel renewed the copyrights in 1966 and 1967. If Sister Hummel's mother, as sole heir of a joint author, was entitled to renew, Goebel holds the renewal rights as the trustee for Schmid, the assignee of Sister Hummel's mother. *Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d 266, 267 (2d Cir.1944).

## III

█ The court finds that Sister Hummel was a joint author of the works. The original certificates of registration of the copyrights recite that the works were "by" her. Under the Copyright Act of 1909, 17 U.S.C. § 209, these certificates are *prima facie* evidence of the facts stated in them. *Epoch Producing Corp. v. Killiam Shows, Inc., supra*, 522 F.2d at 745. Goebel's evidence is insufficient to overcome the *prima facie* case. Moreover, Schmid has submitted evidence that supports the inference that Sister Hummel did indeed contribute to the creation of the five works.

As described above, the agreement between Sister Hummel, the Convent and Goebel dated November 18, 1935, provides not only that she was to approve the sketch and thereafter the completed model, but that the model was to be subject to her "judgment and rectification." That agreement recognizes impliedly, and the August 15, 1939 agreement recognizes explicitly, that Sister Hummel would acquire copyrights in the works manufactured.

In March 1950, in an infringement action in West Germany, Goebel stated of the Hummel figure line that Goebel had acquired from Sister Hummel in 1935 the sole rights to distribute the three-dimensional works based on her sketches and drawings and had, "during the lifetime of the artist, who died in 1946, jointly with her, developed the realization of the individual three dimensional works as to modelling and coloration" (plaintiff's Exhibit 33).

In a September 19, 1967 letter (plaintiff's Exhibits 46 and 47), Goebel's then-counsel, Georg Gewiese, stated that Sister Hummel "created the Hummel drawings and, in her lifetime, participated in the modelling of the Hummel figurines."

Goebel made other like admissions over the years. For example, in August 1949 Goebel stated to the United States Office of Alien Property that the Convent, as alleged beneficiary of Sister Hummel's estate, was a joint owner of the five copyrights in question and that thus, under the United States policy of not vesting property in which a religious institution has an interest, the copyrights should not be vested in the United States. The premise for Goebel's successful contention was that Sister Hummel's contribution was sufficient to give her a co-author's rights to which the Convent succeeded as asserted beneficiary of her estate (plaintiff's Exhibits 57–59).

Goebel's catalogue (plaintiff's Exhibit 49) of 1944 lists the figurines as Sister Hummel's "original creations." In a letter dated April 12, 1960 (plaintiff's Exhibit 51) to a Brigitta Hummel of Saginaw, Michigan, who apparently sought to determine the relationship between her line and that of Sister Hummel, Goebel refers to Sister Hummel as "the creator of the 'Hummel' Figurines." In a calendar issued in 1968 Goebel stated that Sister Hummel "created her world-renowned Hummel figures" (plaintiff's Exhibit 54).

Despite these admissions Goebel urges that "contemporaneous evidence" shows that Sister Hummel did not contribute to the works. Goebel asserts that the original copyright certificates are in error in reciting that the five works were "by" Sister Hummel and that its admissions over many years were likewise erroneous. In particular Goebel refers to certain correspondence as of 1938 and 1939 between Goebel and Sister Hummel or one of the sisters at the Convent relaying Sister Hummel's criticisms, suggestions and approvals.

This correspondence reflects that at least one of the figures (so-called Hum 93) was substantially altered in accordance with the directions of Sister Hummel (defendant's Exhibits U2, Y2, Z2). As to three (so-called Hum 110, Hum 111, and Hum 112) the

"color samples" were approved by Sister Hummel with the request that "the colors be not applied so strong" (defendant's Exhibit B3). An "examina-sample" of the fifth figure (so-called Hum 92) was said by Sister Hummel to be "all right" (defendant's Exhibit W2).

These excerpts from correspondence in 1938 and 1939 with Goebel are insufficient to refute Schmid's proof. The testimony does not establish that the correspondence file contains every written communication between Sister Hummel and Goebel. Nor does the file contain whatever oral communications, whether by telephone or face to face, there were between Sister Hummel and Goebel. Yet the correspondence does show that at least in one instance in 1939, Sister Hummel was in personal contact with Goebel concerning one of the works at issue (Hum 110) (defendant's Exhibits A3 and B3). In addition, Goebel's brochure, dated 1981 (plaintiff's Exhibit 88), printed in German, English and French states that Sister Hummel "herself would spend time ["from time to time" in the German and French versions] at the factory, working with the various artists to ensure that the translation from paper to ceramic was as true as possible."

There is nothing in the record to show that even if the correspondence file is complete, it reflects her every visit to the factory or every contribution that she made.

Goebel also points to its so-called "model book" as supporting its contention that Sister Hummel made no or minimal contributions to the five works. An employee of Goebel since 1944 testified that the book contains "the most important data concerning" a model. This data included Goebel's product designation, the size, description and title of the model, the name of the Goebel artist who worked on it, and the dates on which it was made and a confirmation copy was sent to the Convent.

The model book contains no reference to contributions by Sister Hummel in modeling any figurines, and Goebel says that this justifies an inference that she made no such contribution to the five works. But

Goebel admits that in one instance Sister Hummel participated in the modeling of a figurine, so-called Hum 065, and the book contains no reference to that fact. Moreover, Goebel has admitted that Sister Hummel participated in creating at least some other figurines, and the book does not mention this. It is thus plain that the model book was not designed to record Sister Hummel's contributions.

It is now some forty-five years after the dates when the original copyright registrations were filed. No witness is alive to testify to the extent to which Sister Hummel contributed to the five works. Even if Goebel's admissions were more ambiguous, and its evidence less ambiguous, than this court finds them to be, this would be the very type of case in which it is most appropriate to apply the policy of 17 U.S.C. § 209, which provides that the original copyright certificates of registration establish *prima facie* the facts stated in them. Goebel has not established its contention that those certificates state the facts erroneously.

Schmid also contends that, even if Sister Hummel contributed nothing to the five works, she should be deemed a co-author because they are based on her drawings. The contention is based on *Shapiro, Bernstein & Co., Inc. v. Jerry Vogel Music Co.*, 221 F.2d 569, *modified,* 223 F.2d 252 (2d Cir.1955) (the "12th Street Rag" case). The court need not decide this issue. If Sister Hummel had assigned to the Convent the copyrights in the drawings as a matter of American law, that would not affect the renewal rights to the five works, but it would make Goebel the proprietor, as assignee of the Convent, of the copyrights in the drawings for purposes of applying the "12th Street Rag" case. The court does not reach the question of whether Sister Hummel made such an assignment under United States law.

IV

Goebel's contention that Sister Hummel's contributions, if any, to the five works were made as an employee "for hire" with-

in the meaning of Section 24, rests on her relationship with the Convent. In substance, Goebel urges that, when she entered a Convent of the Franciscans of the Third Order Regular having simple vows, Sister Hummel, while retaining her personal property, took a vow of poverty and thus renounced the free use of her property; that she thus intended all the "fruits" of her labors to pass to the Convent; and that while she did not "work for worldly wages," she made herself available without remuneration for the service of the Convent, expecting nothing other than life-long maintenance and support. All this, says Goebel, means that everything she did was as an employee of the Convent "for hire."

■ The Constitution in Article I, § 8, clause 8, authorizes grants to "authors" and not to their employers. An author may, of course, assign to her employer her rights to exploit the work. But an employer, to be regarded as an "author," must presumably make some significant contribution to the work. The Constitution could hardly have contemplated that mere employment was enough. *Scherr v. Universal Match Corporation*, 417 F.2d 497, 502 (2d Cir.1969) (Friendly, J., dissenting), *cert. denied*, 397 U.S. 936, 90 S.Ct. 945, 25 L.Ed.2d 116 (1970). In any event, the decisions require something more and hold that the "essential factor" or "hallmark" in determining whether a work is made by an employee "for hire" is whether the employer has the right to direct and supervise the actual performance of the work. *Epoch Producing Corporation v. Killiam Shows, Inc., supra*, 522 F.2d at 744; *Scherr v. Universal Match Corporation, supra*, 417 F.2d at 500; *Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc.*, 375 F.2d 639, 643 (2d Cir.1967), *cert. denied*, 389 U.S. 1036, 88 S.Ct. 768, 19 L.Ed.2d 823 (1968); *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1217 (2d Cir.1972), *cert. denied*, 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972). An employer retaining that right may with some justification be deemed an "author."

■ Even assuming that the relationship of Sister Hummel and the Convent was that of employee and employer for some purposes, the court holds that her contributions to the five works were not made as an employee "for hire" as that term has been interpreted by the courts. As Goebel admitted (plaintiff's Exhibit 48), the licensing agreements already referred to, *see supra* pp. 499–501, gave her full artistic control over the line to bear her name. She had the final say as to which of the works would be reproduced and how faithfully. Moreover, she in fact exercised that control.

The Convent contended in the 1950's, in litigation with the West German authorities concerning the income derived from its exploitation of Sister Hummel's works, that the pictures Sister Hummel created were her personal property, which she and not the Convent could dispose of during her lifetime. (Plaintiff's Exhibits 81, 83, 43) The Convent won the tax case based on that contention, and Goebel, which was "financially very interested" in the case (plaintiff's Exhibit 83–15), supplied the Convent with the services of an accountant and legal counsel, and instigated the Convent's marshalling of substantial evidence (plaintiff's Exhibit 83–1). The Convent made it clear that the pictures Sister Hummel produced were freely and independently created by her without any call by the Convent upon her to do so (plaintiff's Exhibits 43, 83–21, 83–16, 83–17, 83–26a). According to Superior Dietrich, while Sister Hummel's extensive work for the parament department was the work of the Convent, her artistic activity on which the Hummel figurines manufactured by Goebel were based was her "personal" activity and not that of the Convent. Superior Dietrich said this was so because such activity "had nothing to do with the purposes and tasks of the Convent," she "worked completely freely and not on orders of the Convent," and she "did this work in her free time" (plaintiff's Exhibit 83–13).

In the light of these representations the fact that the Convent may have incurred minimal expenses for Sister Hummel's sec-

ular work (although that is not clear, *see, e.g.,* plaintiff's Exhibit 83–6), and contributed to some of her art training (*but see* plaintiff's Exhibit 97), is not sufficient to make her an employee "for hire."

There is no reason to doubt the good faith of Superior Dietrich's statements of fact. They are not, contrary to Goebel's contentions, inconsistent with the authority of the Superior over her, or with her assumption of vows of poverty and obedience, or with the exploitation of her works by the Convent.

This court reads the German Supreme Court decision of 1974 (defendant's Exhibit G6), on which Goebel relies, as at most holding that Sister Hummel, by entering the Convent and accepting the vow of poverty and the rules of the Convent, assigned the exploitation rights to her works to the Convent "after the completion of the respective work" (defendant's Exhibit G6, at 20–22). The affidavit of Goebel's expert on German law confirms this reading, stating that the exploitation rights belonged to Sister Hummel "at the moment of creation" but that the German courts "will imply a concurrent assignment" of those rights to the Convent (Stiefel affidavit at 18–19).

Of course, the German court did not in 1974 address itself to American law. The court did not say that Sister Hummel was an employee of the Convent. Even Goebel's other expert has recognized that members of a religious order who create a work are "not exactly employees for hire." B. Ringer, *Renewal of Copyright, Study No. 31* (1960), *reprinted in* 1 *Studies on Copyrights* 505, 533 n. 215 (Arthur Fisher Memorial Ed.1963).

Under Section 24 the issue is not whether Sister Hummel assigned her exploitation rights, but in whom the United States copyrights arose. If "at the moment of creation" those copyrights belonged to Sister Hummel, then her assignment of them during her abbreviated life cannot affect the interest of her heir in the renewal rights. While Sister Hummel took a vow of pover-

ty, her mother, though she was apparently poor, did not.

The parties have disputed at some length the issue of whether the 1974 German decision has "preclusive" effect. Schmid urges that the decision would not have such an effect in Germany and that in any event the decision was obtained by deliberately false statements of fact contrary to those made in the successful litigation with the German tax authorities. The court need not resolve these controversies because the German court did not focus on the issue before this court, namely, whether under Section 24 Sister Hummel made the works as an employee "for hire." The German decision is not inconsistent with the holding of this court that the copyrights arose "at the moment of creation" in Sister Hummel.

### V

Goebel urges finally that the five works were, within the meaning of Section 24, "copyrighted by a corporate body [the Convent] (otherwise than as assignee of licensee of the individual author)". It is not clear just what this "corporate body" language should be read to include, *Shapiro, Bernstein & Co. v. Bryan,* 123 F.2d 697, 699 (2d Cir.1941), and apparently no reported case has ever found it applicable.

The 1938 and 1939 copyright applications and certificates do not suggest that the Convent "copyrighted" the works on those dates. The certificates, which are *prima facie* evidence of the facts stated in them, list Sister Hummel as the author. In an affidavit of August 16, 1949 filed with the United States Office of Alien Property, Sister Laura of the Convent stated that in 1939 Goebel had, "with the consent of" Sister Hummel, registered the five copyrights (plaintiff's Exhibit 58). If Sister Hummel assigned the copyrights to the Convent, its claim as a "corporate body" to the original rights would be "as assignee or licensee of the individual author," and under Section 24 it would have no rights to the renewals.

It may be that the term "work copyrighted by a corporate body" should apply to "impersonal works" such as directories, dictionaries and corporate reports developed by several people. B. Ringer, *supra,* at 531. In addition, where members of a religious order have taken not merely simple vows such as Sister Hummel took but solemn vows, so that they may not own any property at all (plaintiff's Exhibit 83–3), then perhaps the "corporate body" provision may apply. If under Canon law the religious members cannot have any property rights in a work even "at the moment of creation," no one can obtain a copyright unless the religious member can do so.

But here the Convent recognized in the written agreements signed by Sister Hummel, the Convent and Goebel that Sister Hummel possessed the copyrights. Where "at the moment of creation" the exploitation rights belong to Sister Hummel, the Convent can only acquire them from her by "assignment."

It is not significant that the Copyright Office has accepted some "corporate body" claims by religious orders to renew copyrights. The Office looks simply to the face of the renewal claim and "cannot refuse to perform the 'ministerial duty' of registration 'imposed upon [it] by the law.'" *Cadence Industries Corporation v. Ringer,* 450 F.Supp. 59, 65–66 (S.D.N.Y.1978), *quoting Bouve v. Twentieth Century-Fox Film Corp.,* 122 F.2d 51, 56 (D.C.Cir.1941). The Office does not deem its function to be the making of "judicial determinations of substantive renewal rights" and will register multiple claims although they are "in obvious conflict." *Epoch Producing Corporation v. Killiam Shows, Inc., supra,* 522 F.2d at 745–46 (quoting *B. Ringer, supra* ).

## VI

Schmid may have judgment declaring that it has renewal rights in the five works in question. The foregoing constitutes the court's findings of fact and conclusions of law. Settle judgment.