**URANTIA FOUNDATION, Plaintiff,**

v.

**Kristen MAAHERRA, Defendant.**

**Civ. No. 91–0325 PHX WKU.**

United States District Court,
D. Arizona.

Feb. 10, 1995.

L. Dale Owens and Scott A. Wharton of Booth, Wade & Campbell, Atlanta, GA, for plaintiff and counter-defendant, Urantia Foundation.

Joseph D. Lewis of Cleary & Komen, Washington, DC, for defendant and counter-claimant, Kristen Maaherra.

MEMORANDUM AND ORDER ON DE-
FENDANT'S MOTION FOR PAR-
TIAL SUMMARY JUDGMENT ON
COUNT I FOR COPYRIGHT IN-
FRINGEMENT

URBOM, Senior District Judge.

This cause is before me on the Defendant's motion for partial summary judgment pursu-

ant to Rule 56(d) of the Federal Rules of Civil Procedure. The defendant, Kristen Maaherra, asserts that the plaintiff's copyright in *The URANTIA Book* is invalid and thus her copying of the book's text[1] is not prohibited.

## I. FACTUAL BACKGROUND

The plaintiff, Urantia Foundation, brought this action in part to enjoin the defendant from infringing its copyright to *The URAN-TIA Book.* The defendant essentially admits the actions alleged by the plaintiff, but contends that the plaintiff's copyright renewal in the book is invalid. Consequently, the defendant asserts a counterclaim for declaratory judgment and requests that the plaintiff's copyright renewal in *The URANTIA Book* be declared void. The motion for summary judgment is to be decided under the copyright law as it existed under the Copyright Act of 1909.[2]

The genesis of the instant case can be traced back nearly a century. Early in the twentieth century a Chicago physician by the name of William S. Sadler, Sr. was confronted by an individual with extraordinary talents. This individual became a patient of Dr. Sadler's and was studied by him for over eighteen years. During this time the patient communicated numerous and sundry messages, initially to Dr. Sadler and, later, to a small group. The court believes Dr. Sadler made reference to these messages in the appendix to a book he wrote in 1929.[3]

> The communications which have been written, or which we have had the opportunity to hear spoken, are made by a vast order of alleged beings who claim to come from other planets to visit this world, to stop here as student visitors for study and observation when they are en route from one universe to another or from one planet to another. These communications further arise in alleged spiritual beings who purport to have been assigned to this planet for duties of various sorts.

(Def.'s Reply Br. in Supp. of Def.'s Mot. for Partial Summ. J.App. III at 383.) Dr. Sadler concluded the aforementioned appendix by stating, "Our investigations are being continued and . . . I hope some time in the near future to secure permission for the more complete reporting of the phenomena connected with this interesting case." *Id.* at 384.

There is no proof that the patient Dr. Sadler mentioned in his book is the "Contact Personality" to which the parties in the instant case refer; nor is it of particular importance in deciding the motion currently before me. I quote the passage simply because it depicts the generally agreed upon events that help to explain the origin of the "Urantia Papers."

As the "Urantia Papers" came into existence through the Contact Personality, Dr. Sadler and his initial followers[4] assumed certain responsibilities. They "work[ed] directly with the contact personality in the production of the text of the Urantia Papers . . . providing feedback and receiving instructions regarding the disposition of the Papers." (Pl.'s Resp. to Def.'s Req. for Admis. at 25–26.) [hereinafter Pl.'s Admis.] Subsequently, a larger group of individuals[5] was invited to participate in this unique experience.

---

1. The plaintiff does not allege, nor does the defendant admit, a copying of the introductory portions of *The URANTIA Book.* Both parties agree that these portions, entitled "The Titles of the Papers" and "Contents of the Book," were written by William S. Sadler, Jr. (Pl.'s Statement of Facts at 23.) Furthermore, the issues of whether those portions constitute copyrightable subject matter and whether they are protected by the copyright in the book are not under consideration.

2. Act of March 4, 1909, ch. 320, 35 Stat. 1075. Throughout this memorandum, the text refers to this law as the 1909 Act. The citation is 17 U.S.C. § 1 (1976).

3. William S. Sadler, *The Mind at Mischief: Tricks and Deceptions of the Subconscious and How to Cope with Them* (1929).

4. It is generally agreed that these initial five or six followers may be referred to as the "Contact Commission."

5. The parties refer to this larger group of individuals as the "Forum." The Forum, however, never worked directly with or knew the identity of the "Contact Personality."

This larger group's role was "to read and study the early drafts of the text of the Urantia Papers, discuss their content, and submit questions about the subject matter." *Id.* at 88. At the end of this complex and arduous process 196 separate papers were procured and became known as the "Urantia Papers."

Although neither party knows the exact date when the 196 distinct "Urantia Papers" were compiled and became *The URANTIA Book,* it is generally believed to have occurred in the mid–1930's. From that time onward Dr. Sadler and other people who were interested in the messages of *The UR-ANTIA Book* would meet at his home and discuss the book. In 1950 the Urantia Foundation was created by an instrument of trust with an objective of educating the peoples of the world in an attempt to increase and enhance their comfort, happiness, and well being.[6] The foundation was created by and initially included many of the original followers of Dr. Sadler. In 1955 the Urantia Foundation published *The URANTIA Book* and, shortly thereafter, registered its copyright claim with the Copyright Office, as required by federal law. *See* 17 U.S.C. §§ 10, 11 and 13 (1976). On the application for registration the Urantia Foundation claimed it was the sole author of the book. (Pl.'s Compl. Ex. A at 2.) In 1983 the Urantia Foundation applied for and obtained a renewal in the copyright to *The URANTIA Book,* claiming to be the "[p]roprietor of copyright in a work made for hire." (Pl.'s Compl. Ex. B.)

On February 27, 1991, the Urantia Foundation filed a complaint against the defendant, alleging that she had "copied the text of *The URANTIA Book* ... and ... distributed [it] ... throughout the United States." (Pl.'s Compl. at ¶ 13.) Thereafter, the defendant filed her answer in which she "admits copying the text of The Urantia Book ... and admits distributing [it] ... throughout the United States." ((Revised) Def.'s Substitute 2nd Am. Answer and Countercl. at ¶ 13.) The defendant contends, however, that "[t]he

renewal copyright for The Urantia Book was not properly obtained." *Id.* at ¶ 92.

## II. STANDARD OF REVIEW

The standard applied to a motion for partial summary judgment is identical to the standard applied to adjudicate a case fully by summary judgment. The motion shall be granted when, viewing the facts and reasonable inferences in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Calnetics Corp. v. Volkswagen of Am., Inc.,* 532 F.2d 674, 683 n. 11 (9th Cir.), *cert. denied,* 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976). A genuine issue of material fact exists when there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (citing *First Nat. Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). If the moving party meets the initial burden of establishing the nonexistence of a genuine issue, then the burden shifts to the opposing party to produce evidence of the existence of a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted).

## III. LEGAL DISCUSSION

### A. Preliminary Matters

#### 1. Burden of Proof

■ To prevail on the claim of copyright infringement the Urantia Foundation must prove both ownership of a valid copyright and "copying" by the defendant of the protected components of the copyrighted material. *Data East USA, Inc. v. Epyx, Inc.,* 862 F.2d 204, 206 (9th Cir.1988) (citing *Sid & Marty Krofft Television Productions, Inc. v.*

---

6. I acknowledge that in pursuing brevity I have been forced to truncate the Principal Object of the Urantia Foundation as annunciated in its Declaration of Trust. I believe I have, however, preserved its essence.

*McDonald's Corp.*, 562 F.2d 1157, 1162 (9th Cir.1977)). The defendant's admission as to copying the text of *The URANTIA Book* allows me to focus solely on the validity of the plaintiff's copyright.

## 2. Mere Possession of Manuscript

■ The plaintiff claims that "[t]he Contact Commission and Foundation's *exclusive* possession of the unpublished manuscripts and the Foundation's subsequent publication creates a *presumption* that the copyright was *transferred* with the manuscript." (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Partial Summ.J. as to Pl.'s Claim for Copyright Infringement at 4 n. 3.) [hereinafter Pl.'s Br.] (emphasis added). I find at least three weaknesses in the plaintiff's argument. First, I disagree with the plaintiff's assertion that the Contact Commission and the Urantia Foundation had *exclusive* possession of the unpublished manuscripts. "The URANTIA Foundation admits and states that ... the text of at least some of the Papers contained in The URANTIA Book was first set forth in ... handwritten form by a human patient of Dr. William Sadler." (Pl.'s Admis. at 15.) Although the means by which Dr. Sadler obtained those papers is far from clear, it cannot be denied that it was the patient who initially had exclusive possession of at least some of the papers.[7]

Second, the plaintiff's use of the word "presumption" is inaccurate. "A presumption is a rule of law, statutory or judicial, by which finding of a basic fact gives rise to existence of presumed fact, until presumption is rebutted." *Black's Law Dictionary* 1067 (5th ed. 1979) (citation omitted). I do not read the cases cited by the plaintiff to require a presumption of copyright transfer upon the showing of mere possession of a manuscript. *See, e.g., Gerlach–Barklow Co. v. Morris & Bendien, Inc.*, 23 F.2d 159, 161 (2d Cir.1927) ("Plaintiff must next *prove* that he is the 'proprietor' of the painting.") (emphasis added); *Houghton Mifflin Co. v. Stackpole Sons, Inc.*, 104 F.2d 306, 311 (2d

Cir.) ("[P]ossession of the manuscript ... is *evidence* of ownership.") (emphasis added), *cert. denied*, 308 U.S. 597, 60 S.Ct. 131, 84 L.Ed. 499 (1939); *Freudenthal v. Hebrew Pub. Co.*, 44 F.Supp. 754, 755 (S.D.N.Y.1942) (same); *see also* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 10.09[B], at 10–78 (1994) (explaining author's "absolute and unconditional *sale* of the material object carried with it an implied assignment of the common law copyright therein") (emphasis added) [hereinafter *Nimmer*].

Third, each of the cases cited by the plaintiff is easily distinguished from the instant case. In the cases relied upon by the plaintiff there was ample evidence other than the mere possession of the work to support the conclusion that the publisher acquired the work through a proper transfer from the author. Usually, the evidence included a certificate of registration for the original copyright which, by law, was considered *prima facie* evidence of the facts stated therein. However, there was often other evidence. *See, e.g., Houghton Mifflin Co. v. Stackpole Sons, Inc.*, 113 F.2d 627, 628 (2d Cir.1940) (holding copyright to *Mein Kampf* properly transferred to publisher "considering the author's power and position in Germany ... it would be unreasonable to suppose that anyone would have been allowed to [make unauthorized use of it]"); *Ripley v. Findlay Galleries, Inc.*, 155 F.2d 955, 958 (7th Cir.) ("It, therefore, seems inescapable that the proper construction to be placed upon these two letters is that Findlay was authorized by plaintiff to sell any of the paintings ... and to pass complete title thereto without reservation."), *cert. denied*, 329 U.S. 775, 67 S.Ct. 194, 91 L.Ed. 666 (1946).

## 3. Certificate of Renewal as Evidence

■ The plaintiff encourages the court to give the renewal registration certificate "*prima facie* evidentiary value and find that the certificates constitute *prima facie* evidence of the validity of the Foundation's copyright,

---

**7.** The plaintiff's admissions further state that "information available ... indicates that some of the Papers were made known through a group of individuals called the Contact Commission.... [The Foundation] is unable to obtain information from these individuals ... as to whether such Papers initially were in handwriting by a human patient of Dr. William Sadler, or in other form." (Pl.'s Admis. at 15.)

and all facts stated in the certificates." (Pl.'s Br. at 3 n. 1.) The plaintiff claims such action would be proper because "17 U.S.C. § 410(c) . . . provides that the weight given to any certificate issued more than 5 years after publication of the work is left to the Court's discretion." (Pl.'s Br. at 2 n. 1.) I decline the plaintiff's invitation. *See Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1214–15 n. 3 (2d Cir.) (explaining Register of Copyrights typically allows conflicting claimants to register for renewal without determining validity of claim), *cert. denied*, 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972); *Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737, 746 (2d Cir.1975) (holding no presumption of validity attaches to certificate of renewal), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976); *Nimmer* § 9.05[D][2], at 9–88 ("explaining span of time between initial publication and copyright renewal should generally preclude renewal certificate from constituting *prima facie* evidence").

Therefore, I decline both of the plaintiff's entreaties. I will not adhere to the old adage that "possession is nine-tenths of the law," nor will I submit to the minority view that a certificate of copyright renewal is *prima facie* evidence of the facts stated therein. Instead, I will evaluate each piece of evidence according to its independent worth.

### B. The Copyright Act of 1909

The plaintiff renewed its copyright in *The URANTIA Book* in 1983, by which time the Copyright Act of 1976 had become effective. However, the renewal section under which the book falls, Section 304, is identical to that of Section 24 of the Copyright Act of 1909. Furthermore, as the plaintiff correctly states, "[t]he passage of the [1976 Act] did *not* alter the definition of a 'work for hire' for the purpose of renewing a copyright originally registered under the [1909 Act]. . . . Thus, whether *The URANTIA Book* is a 'commissioned work' must be decided under the Copyright Act of 1909." (Pl.'s Br. at 5 n. 4.) *See Stewart v. Abend*, 495 U.S. 207, 217, 110 S.Ct. 1750, 1758, 109 L.Ed.2d 184 (1990) (holding renewal rights in pre–1978 works require Court to "look to the language of and case law interpreting § 24"); *Forward v. Thorogood*, 985 F.2d 604, 606 n. 2 (1st Cir. 1993) (explaining 1976 Act's provisions on works for hire operate prospectively).

The 1909 Act provides statutory copyright protection to "all the writings of an author." 17 U.S.C. § 4 (1976). The Act also extends copyright protection to the "proprietor of any work made the subject of copyright by this title." *Id.* § 9. Although the Act never defines the term "proprietor," it does define the word "author" to "include an employer in the case of works made for hire." *Id.* § 26. "The statute represents a codification of the so-called 'works for hire' doctrine recognized by the Supreme Court in *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 23 S.Ct. 298, 47 L.Ed. 460 (1903)." *Murray v. Gelderman*, 566 F.2d 1307, 1309 (5th Cir. 1978). Therefore, one claiming the initial term of copyright must either be "the author of the copyrightable work (i.e., either the individual *creator* or the *employer* in the case of works made for hire . . . or he must have succeeded to the rights of the author *through an assignment or other device*.")[8] *Epoch*, 522 F.2d at 743 (citation omitted) (emphasis added).

The right to renew a copyright under the 1909 Act is determined exclusively by Section 24. Although the renewal has been described as not simply an extension of the initial term of copyright, *id.*, but rather the creation of "a new estate",[9] separate and distinct from the original copyright,[10] the section does utilize the same aforementioned terms and principles. Section 24 states in pertinent part:

---

8. I might simply add the term "legally valid" before the word assignment to ensure absolute accuracy of the phrase.

9. *See G. Ricordi & Co. v. Paramount Pictures, Inc.*, 189 F.2d 469, 471 (2d Cir.), *cert. denied*, 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951); *Fred*

*Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643, 63 S.Ct. 773, 87 L.Ed. 1055 (1943).

10. *See Edward B. Marks Music Corp. v. Charles K. Harris Music Publishing Co.*, 255 F.2d 518, 521 (2d Cir.), *cert. denied*, 358 U.S. 831, 79 S.Ct. 51, 3 L.Ed.2d 69 (1958).

That in the case of any posthumous work or of any periodical, cyclopedic, or other composite work upon which the copyright was originally secured by the proprietor thereof, or ... by an employer for whom such work is made for hire, the proprietor of such copyright shall be entitled to a renewal and extension of the copyright in such work for the further term of twenty-eight years.

17 U.S.C. § 24 (1976). The plaintiff claims its renewal copyright in *The URANTIA Book* is valid "because it is the proprietor, and the work is both a 'work for hire' and a 'composite work' within the meaning of the applicable copyright law." (Pl.'s Br. at 3.) I do not find sufficient evidence to support either claim.

### C. Claiming as Proprietor of Copyright

#### 1. Works for Hire Doctrine

■ I accept the plaintiff's contention that "an anonymous individual known simply as the 'contact personality' ... had some involvement with the physical process by which the 'Urantia Papers' were written down[, but] ... did not contribute any copyrightable expression to the papers ... [and therefore] is not an author of any part of *The URANTIA Book.*" (Pl.'s Br. at 4 n. 2.) I interpret the Contact Personality's role to be that of a mere scribe, unable to be the author of that which it mechanically transcribes. Furthermore, I agree with the plaintiff's contention that under the 1909 Act the "works for hire" doctrine was broad enough to include both traditional employees and individuals commissioned for a particular project.

[W]hen one person engages another, whether as employee or as an independent contractor, to produce a work of an artistic nature, that in the absence of an express contractual reservation of the copyright in the artist, the presumption arises that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done.

*Lin–Brook Builders Hardware v. Gertler,* 352 F.2d 298, 300 (9th Cir.1965) (citations omitted).

However, the "works for hire" doctrine is premised on the plaintiff's ability to prove an employment relationship. Without credible evidence of an actual employment relationship, the "works for hire" doctrine has no application. *Murray,* 566 F.2d at 1310. Consequently, in the absence of such a relationship, a court will not deny an author its constitutional right to a copyright in its work. Therefore, the crucial question is whether there is sufficient evidence to support the conclusion that there was an employment relationship between Dr. Sadler's patient and either Dr. Sadler or the Contact Commission.[11] I find that there is not.

Courts have relied upon numerous factors to determine whether an alleged employment relationship exists.

The crucial element in this determination appears to be whether the work was created at the employer's insistence and expense, or, in other words, whether the motivating factor in producing the work was the employer who induced its creation. Another factor is whether the employer had the *right* to direct and supervise the manner in which the work was being performed. Actual exercise of that right is not controlling, and copyright is vested in the employer who has no intention of overseeing the detailed activity of any employee hired for the very purpose of producing the material. In addition, the nature and amount of compensation or the absence of any payment for the work may be considered but are of minor importance.

*Murray,* 566 F.2d at 1310 (citations omitted). Each of the aforementioned factors, considered in light of the facts of the instant case,

---

11. The plaintiff suggests that the individual members of the Contact Commission and the Forum may also have been employees for hire within the meaning of the 1909 Act. (Pl.'s Admis. at 115.) However, it is the patient from whom, ultimately, the "Urantia Papers" came. The plaintiff does not suggest that Dr. Sadler could have acquired the "Urantia Papers" by working strictly with the Contact Commission or Forum and without the patient or the "personalities." Therefore, the only employment relationship that could conceivably manifest copyright rights in the plaintiff would be one in which the patient was the employee.

suggests the absence of an employment relationship.

Originally, it was the patient who sought Dr. Sadler, and not as an employer but as a therapist. The first "Urantia Papers" were not created at the insistence of Dr. Sadler, nor was the thought of their creation conceived by Dr. Sadler or the Contact Commission. Furthermore, there is no evidence that indicates the patient ever intended to deviate from the established doctor-patient relationship.

More important, there is no evidence that either Dr. Sadler or the Contact Commission had any power to induce, direct, supervise, oversee, or control the actual production of a single "Urantia Paper." It appears as though Dr. Sadler and the Contact Commission were simply reacting to the independent activity of the patient. The plaintiff admits that it was the Contact Commission that was given instructions, responsibilities, and authority by the "personalities" emanating from the patient. (Pl.'s Admis. at 12.) Typically, however, it is the employer who gives instructions and delegates responsibilities, not the employee. The plaintiff essentially concedes that the Contact Commission lacked any power to control the production of the "Urantia Papers" when it states that although the Contact Commission would submit questions,[12] it was the "personalities" that determined which questions would be considered and what would be included in the text. *Id.* at 13. The plaintiff states that "without the questions, there would be *no* papers." (Pl.'s Br. at 7.) The facts show, however, that the papers came before the questions, and that the questions were in response to the papers. Showing that the author chose to expand a particular paper in the wake of questions falls far short of meeting the plaintiff's burden of showing that the author was *required* to do so as a subservient employee. Absent some credible evidence of an employment relationship, the existence of evidence that may be as consistent with such a relationship as it is with various other hypotheses cannot be bootstrapped to reme-

dy the basic deficiency, which is the absence of any proof that the patient was in fact hired by Dr. Sadler or the Contact Commission to write the "Urantia Papers." *See Epoch,* 522 F.2d at 744–45.

Each of the cases relied upon by the plaintiff is good law on the topic of the "works for hire" doctrine as construed under the 1909 Act, but each is distinguishable from the instant case. For example, the plaintiff directs the court's attention to *Dielman v. White,* 102 F. 892 (C.C.D.Mass.1900). In that case, however, there were numerous items of correspondence that proved that the plaintiff was offered a commission to design a particular work, accepted it, and then entered into a formal work order. Similarly, there were express employment contracts in many of the other cases cited by the plaintiff. *E.g., Yardley v. Houghton Mifflin Co.,* 108 F.2d 28, 29 (2d Cir.1939) (finding artist executed his painting pursuant to a written contract), *cert. denied,* 309 U.S. 686, 60 S.Ct. 891, 84 L.Ed. 1029 (1940); *Siegel v. National Periodical Pub., Inc.,* 508 F.2d 909, 911 (2d Cir.1974) (finding plaintiff entered into initial and supplemental employment agreements); *Shapiro, Bernstein & Co. v. Bryan,* 123 F.2d 697, 698 (2d Cir.1941) (finding plaintiff employed each artist under a written employment contract).

Moreover, even in the cases where there was not an express employment contract, there was an abundance of evidence to support the conclusion that an employer-employee relationship existed. *E.g., Lin–Brook Builders Hardware,* 352 F.2d at 300 n. 3 (finding artist admitted being employed by plaintiff and disavowed any interest in work performed); *Picture Music,* 457 F.2d at 1217 (finding artist was sought out, given a pre-existing work, instructed to modify it, and paid for her efforts); *Murray,* 566 F.2d at 1310 (finding plaintiff basically admitted being employee in a letter written to defendant).

In the instant case, even affording the plaintiff the benefit of every doubt, I fail to discern the existence of an employment rela-

---

**12.** I assume that these were questions to which the Contact Commission earnestly desired an answer.

tionship. To find that the plaintiff is the author of *The URANTIA Book* pursuant to the "works for hire" doctrine on the basis of the evidence relied upon by the Urantia Foundation "would be to substitute mere speculation for reason and experience." *Epoch,* 522 F.2d at 744.

### 2. Composite Works

■ The plaintiff earnestly argues that *The URANTIA Book* is a composite work. This is the plaintiff's attempt to validate its copyright renewal, not by claiming that it is the author of the book based upon the "works for hire" doctrine but by claiming it is the proprietor of a composite work who originally secured the copyright in the work. As previously mentioned, Section 24 of the 1909 Act entitles such a proprietor "to a renewal and extension of the copyright in such work." 17 U.S.C. § 24 (1976).

I agree that *The URANTIA Book* may be considered a composite work, if the term is simply defined as a work "to which a number of authors have contributed distinguishable parts, which they have not however 'separately registered.'" *Shapiro,* 123 F.2d at 699. The book, itself, suggests that it was written by "a number of authors." The "Urantia Papers" are obviously "distinguishable parts" and the Copyright Office verifies that no other author of the book has "separately registered." Such concessions, however, do not benefit the plaintiff.

The legislative history shows that the determinative factors in a 'composite work' were:

1) A number of authors contributing copyrightable matter to a single work; and

2) An *employment or contractual arrangement* entitling the proprietor to secure copyright in the various contributions.

*Cadence Industries Corp. v. Ringer,* 450 F.Supp. 59, 64 (S.D.N.Y.1978) (quoting Ringer, *Renewal of Copyright* (1960)).

As already discussed in depth, the evidence is insufficient to substantiate the claim that the plaintiff became the author of *The URANTIA Book* through an employment arrangement. The plaintiff is therefore relegated to arguing that it is the proprietor. However, "'[p]roprietor' is the equivalent of 'assign'; a 'proprietor' must trace title from the author." *Quinn–Brown Publishing Corp. v. Chilton Co.,* 15 F.Supp. 213, 214 (S.D.N.Y.1936) (citing *Mifflin v. R.H. White Co.,* 190 U.S. 260, 23 S.Ct. 769, 47 L.Ed. 1040 (1903); *Public Ledger v. New York Times,* 275 F. 562 (S.D.N.Y.1921), *aff'd,* 279 F. 747 (2d Cir.), *cert. denied,* 258 U.S. 627, 42 S.Ct. 383, 66 L.Ed. 798 (1922)). "And, in pleading a case of infringement, the plaintiff must show title, not merely by broad allegation of proprietorship, but by setting forth facts which indicate how he became proprietor." *Quinn–Brown,* 15 F.Supp. at 214 (citations omitted). The plaintiff channels its efforts toward proving that the structure of *The URANTIA Book* satisfies the definition of a composite work, but is unable to offer evidence that the individual "Urantia Papers" were transferred pursuant to a contractual arrangement, entitling the plaintiff to become their proprietor. Ultimately, I find insufficient evidence to suggest that the plaintiff acquired the "Urantia Papers" in any way other than serendipitously.

**IT IS THEREFORE ORDERED** that the defendant's motion for partial summary judgment, filing 199, is granted as to (1) Count I of plaintiff's complaint for copyright infringement; and (2) Count I of defendant's counterclaim declaring the copyright renewal in *The URANTIA Book* to be invalid.