**URANTIA FOUNDATION, a non-profit foundation, Plaintiff–Appellant,**

v.

**Kristen MAAHERRA, Defendant–Appellee.**

No. 95–17093.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 14, 1997.

Decided June 10, 1997.

Gordon Dean Booth, Jr., Booth, Owens & Jospin, Atlanta, Georgia, and Robert S. Venning, Heller, Ehrman, White & McAuliffe, San Francisco, CA, for plaintiff-appellant.

Joseph D. Lewis, Cleary, Komen & Lewis, LLP, Washington, DC, Robert C. Lind, Los Angeles, CA, for defendant-appellee.

Before DONALD P. LAY,[*] GOODWIN, and SCHROEDER, Circuit Judges.

## OPINION

SCHROEDER, Circuit Judge:

This is a copyright dispute between parties who believe the copyrighted work, the Urantia Book, was authored by celestial beings and transcribed, compiled and collected by mere mortals. In this litigation, the plaintiff-appellant Urantia Foundation claims that the defendant-appellee Kristen Maaherra infringed the Foundation's copyright when she distributed a computerized version of the Book on disk. Maaherra concedes copying, so the only issue before us is whether the Foundation owns a valid copyright in the Book.

The district court granted summary judgment to Maaherra on the ground that the

[*] The Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

Foundation's renewal copyright was invalid. *Urantia Foundation v. Maaherra*, 895 F.Supp. 1347 (D.Ariz.1995).[1] The court determined that the Foundation was not a proper renewal claimant because the Book was not a "work made for hire," as claimed on the renewal certificate, and that even though the Book could have qualified as a "composite work," the Foundation had failed to show that it was its "proprietor." *See* 17 U.S.C. § 304(a) (providing that proprietors of composite works and works made for hire can claim renewal). We conclude that the Foundation has established that it was, at the time of renewal, the proprietor of a composite work, and that the mistaken description on the renewal certificate does not affect the validity of the renewal. We therefore reverse the district court's grant of summary judgment in favor of Maaherra.

## BACKGROUND

Central to an understanding of the case is the history, as perceived by both parties, of the creation of the Book. Both parties believe that the words in the Book were "authored" by non-human spiritual beings described in terms such as the Divine Counselor, the Chief of the Corps of Superuniverse Personalities, and the Chief of the Archangels of Nebadon. These spiritual entities are thought to have delivered the teachings, that were eventually assembled in the Book, "through" a patient of a Chicago psychiatrist, Dr. Sadler.

The parties also agree that to understand these divine messages better and to share them with the rest of the world, Dr. Sadler formed a group of five or six followers, called the Contact Commission. At first, the members of the Contact Commission started discussing the divine teachings among themselves. Then, apparently in response to what *they* perceived to be *prompting* from the spiritual beings, and in collaboration with a larger group of followers called the Forum, the Contact Commission began to pose specific questions to the spiritual beings. The answers to these questions, as transmitted to the humans and arranged by them, became the Urantia Papers. At some point, the manuscript containing the Papers was intentionally destroyed after the creation of about 2,000 printing plates.

Members of the Contact Commission, including founding member Dr. Sadler, then formed the Urantia Foundation, an Illinois charitable trust, for one purpose: to preserve and disseminate the teachings contained in the Papers. It appears that the Foundation was, at least initially, headquartered at Dr. Sadler's home. The Contact Commission transferred the printing plates to the Foundation through the trust instrument.

The transfer is detailed in a district court opinion, arising in another circuit, and also involving the validity of the Foundation's copyright in the Book, but analyzing the validity of the original, rather than the renewal copyright. *Urantia Foundation v. Burton*, 210 U.S.P.Q. 217 (W.D.Mich.1980). The *Burton* court found that the trust instrument described the Foundation's primary estate as consisting of the printing plates on which the Papers were inscribed. The instrument also provided that the trustees were specifically empowered, and had the duty, "to retain absolute and unconditional control of all plates and other media for the printing and reproduction of the Urantia Book and any translation thereof...." *Id.* at 219 (citing to Paragraph 3.3 of the trust instrument).

The Foundation published the Book in 1955. The original copyright certificate was issued to the Foundation in 1956. The Foundation renewed the copyright in 1983.

In 1990, Maaherra, who resides in Arizona, and who describes herself as "an avid reader of the [Book] since 1969," prepared a study aid that included the entire text of the Book and started distributing it free of charge to various individuals. That same year, the Foundation learned that someone was distributing the Book on computer disks, using

---

**1.** The district court published six orders: *Urantia Foundation v. Maaherra*, 895 F.Supp. 1328 (D.Ariz.1995); *Urantia Foundation v. Maaherra*, 895 F.Supp. 1329 (D.Ariz.1995); *Urantia Foundation v. Maaherra*, 895 F.Supp. 1335 (D.Ariz. 1995); *Urantia Foundation v. Maaherra*, 895 F.Supp. 1337 (D.Ariz.1995); *Urantia Foundation v. Maaherra*, 895 F.Supp. 1338 (D.Ariz.1995); *Urantia Foundation v. Maaherra*, 895 F.Supp. 1347 (D.Ariz.1995).

the Foundation's trademarks. Upon discovering that Maaherra was responsible for this, the Foundation filed the instant suit in 1991. *See Urantia Foundation v. Maaherra*, 895 F.Supp. 1338 (D.Ariz.1995) (recounting this chronology).

This appeal is from the district court's October 25, 1995 amended final judgment based on its February 10, 1995 order granting summary judgment to Maaherra on the Foundation's copyright infringement claim. *See Urantia*, 895 F.Supp. at 1347.

## DISCUSSION

### Copyrightability of the Book

■ A threshold issue in this case is whether the work, because it is claimed to embody the words of celestial beings rather than human beings, is copyrightable at all. "To qualify for copyright protection, a work must be original to the author." *Feist Publications, Inc. v. Rural Telephone Service Company, Inc.*, 499 U.S. 340, 345, 111 S.Ct. 1282, 1287, 113 L.Ed.2d 358 (1991) (citation omitted). The core statute, 17 U.S.C. § 102(a), provides:

> [c]opyright protection subsists ... in original works of authorship fixed in any tangible medium of expression, ... from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.

17 U.S.C. § 102(a). "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist*, 499 U.S. at 345, 111 S.Ct. at 1287 (citation omitted).

Maaherra claims that there can be no valid copyright in the Book because it lacks the requisite ingredient of human creativity, and that therefore the Book is not a "work of authorship" within the meaning of the Copyright Act. The copyright laws, of course, do not expressly require "human" authorship, and considerable controversy has arisen in recent years over the copyrightability of computer-generated works. *See* Arthur R. Miller, *Copyright Protection for Computer Programs, Databases, and Computer-Gener-* *ated Works: Is Anything New Since CONTU?*, 106 Harv.L.Rev. 977 (1993). We agree with Maaherra, however, that it is not creations of divine beings that the copyright laws were intended to protect, and that in this case some element of human creativity must have occurred in order for the Book to be copyrightable. At the very least, for a worldly entity to be guilty of infringing a copyright, that entity must have copied something created by another worldly entity.

The district court held that the Book was copyrightable. However, if the court erred in this regard, we need not reach the other issues in the case.

The copyrightability issue is not a metaphysical one requiring the courts to determine whether or not the Book had celestial origins. In this case, the belief both parties may have regarding those origins, and their claim that the Book is a product of divine revelation, is a matter of faith, and obviously a crucial element in the promotion and dissemination of the Book. For copyright purposes, however, a work is copyrightable if copyrightability is claimed by the first human beings who compiled, selected, coordinated, and arranged the Urantia teachings, "in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101 (defining a "compilation"). *See also* 17 U.S.C. § 103 (providing that compilations are copyrightable). Those who were responsible for the creation of the tangible literary form that could be read by others, could have claimed copyright for themselves as "authors," because they were responsible for the revelations appearing " 'in such a way' as to render the work as a whole original." *Feist*, 499 U.S. at 358, 111 S.Ct. at 1294 (referring to the statutory definition of compilation).

The Supreme Court in *Feist, supra*, held that the white pages of the plaintiff's telephone directory did not qualify for copyright protection, because there was nothing original about listing names of the area's telephone subscribers in alphabetical order. Yet *Feist* also recognized that a compilation of facts may possess the requisite originality when the author chooses which facts to include, in what order to place them, and how

to arrange the data so that readers may use them effectively. *Feist* simply reaffirmed what the statute provides and what had been known since *The Trade–Mark Cases,* 100 U.S. 82, 25 L.Ed. 550 (1879) and *Burrow–Giles Lithographic Co. v. Sarony,* 111 U.S. 53, 4 S.Ct. 279, 28 L.Ed. 349 (1884): that copyright protection only extends to those components of the work that are "original" to the "author", and not to the facts themselves. *Feist,* 499 U.S. at 346–47, 350–51, 111 S.Ct. at 1288–89, 1290–91.

■ In this case, the Contact Commission may have received some guidance from celestial beings when the Commission posed the questions, but the members of the Contact Commission chose and formulated the specific questions asked. These questions materially contributed to the structure of the Papers, to the arrangement of the revelations in each Paper, and to the organization and order in which the Papers followed one another. We hold that the human selection and arrangement of the revelations in this case could not have been so "mechanical or routine as to require no creativity whatsoever." *Feist,* 499 U.S. at 362, 111 S.Ct. at 1296. We conclude, therefore, that the "extremely low" threshold level of creativity required for copyright protection has been met in this case. *See Feist,* 499 U.S. at 345, 111 S.Ct. at 1287. ("The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble, or obvious' it might be.") (quotation omitted).

It must be remembered that the claim of copyright infringement in this case concerns the verbatim copying of the entire Urantia Book, including the selection and arrangement of the revelations into the Papers that comprise the Book. This case does not concern the use of a single "revelation" outside the context of the Book, which for purposes of this case would be analogous to a "fact," and which of course would not be copyrightable. *See Feist,* 499 U.S. at 347, 111 S.Ct. at 1288–89.

This principle, the distinction between revelations as facts and the expression of these revelations, was recognized in a 1941 copyright infringement case that involved similar claims of divine authorship. *Oliver v. Saint Germain Foundation,* 41 F.Supp. 296 (S.D.Cal.1941). In *Oliver,* as here, the plaintiff's religious text proclaimed that the facts contained in the text had come straight from a spirit, and that the spirit was the author of the history in the text. *Id.* at 297. In that case, however, the plaintiff (unsuccessfully) claimed copyright protection in the divine revelations themselves, and in the methods of spiritual communication, rather than in the plaintiff's specific selection or arrangement of these divine revelations. The defendant in *Oliver* had not copied that arrangement and selection, but simply had written another text using the same divine "facts." *Id.* at 299. The court in *Oliver* made it clear that, had the claim been that the selection and arrangement of the divine revelations had been infringed, the plaintiff's copyright infringement claim might have had merit. *Id.*

Thus, notwithstanding the Urantia Book's claimed non-human origin, the Papers in the form in which they were originally organized and compiled by the members of the Contact Commission were at least partially the product of human creativity. The Papers thus did not belong to that "narrow category of works in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent." *Feist,* 499 U.S. at 359, 111 S.Ct. at 1294 (citation omitted). Therefore, the Papers were works amenable to common law copyright protection, and the district court correctly so held.

### Ownership of the Copyright at the Time of Original Publication

The district court held that even though a common law copyright was created at the time the Papers came into being, the Foundation itself had not adequately shown that it owned that copyright in 1955, when it published the Book, so as to entitle it to claim the statutory copyright. *Urantia,* 895 F.Supp. at 1350–51, 1354. Because the district court was of the opinion that the Foundation had come into possession of the plates "serendipitously," the court found that the Foundation had failed to establish how it had become the "proprietor" of the copyright in the Papers. *Id.* at 1354.

The district court accurately observed that the selection of Dr. Sadler's patient as the amanuensis for communicating the teachings eventually transcribed on the plates was indeed serendipitous. We believe the controlling issue, however, is whether, as of the time of publication, the Foundation, the copyright claimant, could trace its title back to the humans who owned the original common law copyright. We hold that it could.

■ Under the 1909 Copyright Act, 17 U.S.C. §§ 1, *et. seq.* (superseded in 1978), an unpublished work was protected by common law copyright from the moment it was created, until it was either published with proper notice, or otherwise received protection under federal copyright law. *See Twin Books Corp. v. Walt Disney Co.*, 83 F.3d 1162, 1165 (9th Cir.1996). The Papers were therefore protected by common law copyright from the moment they were created by the members of the Contact Commission until publication of the Book. The question is whether those humans transferred that copyright to the Foundation.

■ Even though the precise words "assign" or "transfer" do not appear in the trust instrument, the members of the Contact Commission demonstrated their intent to transfer the common law copyright in the Papers to the Foundation both through the language of the trust instrument itself, and by delivery of the printing plates to the Foundation. The trust instrument provided that the trustees of the Foundation were "to retain absolute and unconditional control of all plates and other media for the printing and reproduction of the Urantia Book and any translation thereof...." *See Burton, supra*, at 219. Under the 1909 Act, a common law copyright could be assigned without the necessity of observing any formalities. D. Nimmer & M.B. Nimmer, *Nimmer on Copyright*, § 10.03[B][2], at 10–45 (1996) [hereinafter *Nimmer*]. In fact, the mere possession of the printing plates by the Foundation, the purported assignee, may have been sufficient to establish an assignment as against a third party, such as Maaherra, who does not claim any superior copyright interest. *Id.* at 10–46. Professor Nimmer notes that "[t]his was

particularly true where over a long period of time, the author and other interested parties had acquiesced in the putative assignee's ownership." *Id.* (citing, *inter alia, Burton, supra*). Because the intent to transfer ownership of the plates to the Foundation was clear, and the plates were delivered to the Foundation, we hold that the members of the Contact Commission also intended to transfer, and did in fact transfer, their copyright in the Papers to the Foundation. Thus, when the Foundation published the Book in 1955, the original statutory copyright in the Book automatically vested in the Foundation. *See Nimmer*, § 9.01[B][2] at 9–17.

That does not conclude our inquiry, however, because we are dealing here not only with the validity of the original copyright, but with the validity of the renewal.

### Validity of the Renewal

Maaherra challenges on a number of theories, the validity of the copyright renewal certificate the Foundation obtained in 1983. The certificate stated that the Foundation was claiming renewal as the "proprietor of copyright in a work made for hire." Maaherra first contends that the Book was not a "work made for hire" and that the renewal for that reason is invalid.

The 1983 version of the renewal provision of the 1976 Copyright Act, applicable to the Foundation's renewal, had two provisos: one dealing with renewals by proprietors of certain works and the other dealing with the renewals of all other works. The statute stated in relevant part:

> Any copyright, the first term of which is subsisting on January 1, 1978, shall endure for twenty-eight years from the date it was originally secured: *Provided,* that in the case of any posthumous work or of any periodical, cyclopedic, or other composite work upon which the copyright was originally secured by the proprietor thereof, or of any work copyrighted by a corporate body (otherwise than as assignee or licensee of the individual author), or by an employer for whom such work is made for hire, the proprietor of such copyright shall

be entitled to a renewal and extension of the copyright in such work for the further term of 47 years.... *And provided further,* that in the case of any other copyrighted work, including a contribution by an individual author to a periodical or to a cyclopedic or other composite work, the author of such work, if still living, or the widow, widower, or children of the author, if the author be not living, or if such author, widow, widower, or children be not living, then the author's executors, or in the absence of a will, his or her next of kin shall be entitled to a renewal and extension of the copyright in such work for a further term of 47 years....

17 U.S.C. § 304(a)(1983).

■ As to whether the Book was a "work made for hire," Maaherra is probably correct that it was not. The Foundation was never the employer of any of the spiritual beings, of Dr. Sadler, of the Contact Commission, or of any other entity that played a role in the creation of the Papers that were eventually transferred to the Foundation. An employment (or commissioning) relationship at the time the work is created is a condition for claiming renewal as the proprietor of a "work made for hire". *See* 17 U.S.C. § 101; *Bleistein v. Donaldson Lithographing Co.,* 188 U.S. 239, 23 S.Ct. 298, 47 L.Ed. 460 (1903); *Lin–Brook Builders Hardware v. Gertler,* 352 F.2d 298 (9th Cir.1965); *Rohauer v. Friedman,* 306 F.2d 933 (9th Cir.1962).

■ Before the district court and on appeal, the Foundation has contended that it would have been entitled to claim renewal as the "proprietor of a composite work." The district court rejected this contention. *Urantia,* 895 F.Supp. at 1354. The problem, in the district court's view, was not whether the structure of the Book satisfied the definition of a "composite work;" the district court assumed that it did. Rather, the district court held that the Foundation had failed to establish "proprietorship" at the time the original copyright was secured because it had failed to show a "contractual arrangement entitling

[it] to secure copyright in the various contributions." *Urantia,* 895 F.Supp. at 1354 (citing *Cadence Industries Corp. v. Ringer,* 450 F.Supp. 59, 64 (S.D.N.Y.1978)). On this point, we have held the court erred. The language of the trust instrument was, moreover, very broad, and sufficient to transfer not only the interest in the original copyright term, but in the renewal as well. *See Burton, supra,* at 219.

Maaherra on appeal also contends that even if the Foundation would have been entitled to secure the Book's renewal rights as the "proprietor of a composite work," the inaccuracy in the description of the claim in the Foundation's application for renewal destroyed the validity of its renewal copyright. This issue the district court did not decide.

Timeliness was the only clear statutory requirement for copyright renewal of a work whose original statutory copyright was secured prior to January 1, 1964. The renewal statute in effect at the time the Foundation renewed its copyright in the Book required the claimant to apply for and register its renewal claim within the last year of the original copyright term. *See* 17 U.S.C. § 304(a) (1983) (providing that copyright was properly renewed "where application for ... renewal ... shall have been made to the Copyright Office and duly registered therein within one year prior to the expiration of the original term of copyright" and that "in default of the registration of such application for renewal ... the copyright in any work shall terminate at the expiration of twenty-eight years from the date copyright was originally secured[ ]").[2] Thus, the Foundation had to renew the Book's copyright by December 31, 1983, when the original copyright term was to expire. *See* 17 U.S.C. § 305 (copyright terms "run to the end of the calendar year in which they would otherwise expire[ ]"). The Foundation timely applied for renewal in January of 1983.

■ Maaherra contends, however, that timeliness is not enough. Focusing on the language of the first proviso of Section

**2.** The harshness of that rule led Congress to amend the renewal provision in 1992 to provide for automatic renewal. *See* Copyright Renewal Act of 1992, Pub.L. 102–307, Sec. 101, 106 Stat.

264 (June 26, 1992) (applying only to works whose original statutory copyright was obtained after December 31, 1963).

304(a), and on a Copyright Office regulation which provides the manner in which renewal registrations may be corrected, 37 C.F.R. § 201.5(b)(2)(iv), she argues that because the renewal certificate described the Foundation as the "proprietor of a work made for hire" rather than as the "proprietor of a composite work", the renewal registration is not valid.

The regulation upon which Maaherra relies, provided in 1983:

> Supplementary registration to correct a renewal claimant or basis of a claim in a basic renewal registration may be made only if the application for supplementary registration and fee are received in the Copyright Office within the statutory time limits for renewal. If the error or omission in a basic renewal registration is extremely minor, and does not involve the identity of the renewal claimant or the legal basis of the claim, supplementary registration may be made at any time. Supplementary registration is not appropriate to add a renewal claimant.

37 C.F.R. § 201.5(b)(2)(iv) (1983). The regulation would thus have permitted the Foundation to file a supplementary registration to correct its basic registration at any time during the renewal period, if the error was minor and did not "involve the identity of the renewal claimant or the legal basis for the claim." *Id.* However, corrections to the "identity" of the claimant or to the "legal basis of the claim" could only have been made within the statutory time limits for renewal, which in this case would have expired December 31, 1983.

Maaherra claims that because the error the Foundation made in describing the nature of its proprietorship involves "the legal basis of the claim," the error can no longer be corrected, and therefore, the Book was injected into the public domain in 1983. There are serious problems with this argument.

First, it is not at all clear that the regulation's reference to the "legal basis of the claim" contemplates the identification of a particular type of proprietorship described in the first proviso of section 304(a). Given the structure of the statute, the general term "proprietor" was probably sufficient to iden-tify the "legal basis" of the renewal claim in 1983.

Moreover, we have found no case that has ever held a renewal invalid for lack of an adequate description of the basis of the claim. The only cases in which renewals have been forfeited have involved renewals filed by the wrong claimant, not by someone describing the wrong type of proprietorship. The second proviso of section 304(a) establishes the priority to renewal rights for authors and their statutory heirs. There are cases holding renewal registrations under this proviso void, where the renewal was filed in the name of a person who was a member of the next succeeding class, when members of a priority class living at the time the renewal vested should have filed the renewal, but did not. *See Nimmer* § 9.05[D][1] at 9–85 (citing, *inter alia, Marks Music Corp. v. Borst Music Pub. Co. Inc.,* 110 F.Supp. 913 (D.N.J.1953); *Yardley v. Houghton Mifflin Co.,* 25 F.Supp. 361 (S.D.N.Y.1938), *aff'd,* 108 F.2d 28 (2d Cir.1939)). In such cases, however, in contrast to the situation here, the person filing for renewal was not statutorily entitled to renew under any theory; someone else was. *See International Film Exch., Ltd. v. Corinth Films, Inc.,* 621 F.Supp. 631 (S.D.N.Y.1985) (rejecting renewal application because the renewal was filed in the name of a licensee, instead of being filed in the name of the author, or by the copyright proprietor). As we have seen, the Foundation was in fact a proper renewal claimant because it was the "proprietor" of the Book both in 1955 and in 1983.

Furthermore, even the requirement of accurate identification of the renewal claimant has not been rigidly enforced. In at least one case, the actual name of the claimant corporation was mistakenly stated in the renewal application, yet the infringement action was permitted to go forward. *Bourne Co. v. Walt Disney Co.,* 25 U.S.P.Q.2d 1975, 1976 (S.D.N.Y.1992), *aff'd on other grounds,* 68 F.3d 621 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1890, 135 L.Ed.2d 184 (1996). *See also Nimmer,* § 9.05[D][1] at 9–85–86, (favorably citing *Bourne* for refusing to cause a forfeiture of copyright based on "useless technicalities").

All of this strongly suggests that even if the Foundation can no longer correct the "work made for hire" description of its proprietorship claim on the renewal form, the Foundation's renewal copyright is not invalid. There is, however, even more compelling authority for this result.

■ The case law is overwhelming that inadvertent mistakes on registration certificates do not invalidate a copyright and thus do not bar infringement actions, unless the alleged infringer has relied to its detriment on the mistake, or the claimant intended to defraud the Copyright Office by making the misstatement. *See, e.g., Nimmer,* § 7.20 at 7–201 and n. 6 ("[A] misstatement or clerical error in the registration application if unaccompanied by fraud will not invalidate the copyright or render the registration certificate incapable of supporting an infringement action."), *S.O.S, Inc. v. Payday,* 886 F.2d 1081 (9th Cir.1989); *Harris v. Emus Records,* 734 F.2d 1329 (9th Cir.1984) (citing to *Burton, supra,* and *Urantia Foundation v. King,* 194 U.S.P.Q. 171, 174–175 (C.D.Cal. 1977)); *Datastorm Technologies, Inc. v. Excalibur Communications, Inc.,* 888 F.Supp. 112 (N.D.Cal.1995); *Gund, Inc. v. Swank, Inc.,* 673 F.Supp. 1233 (S.D.N.Y.1987); *Craft v. Kobler,* 667 F.Supp. 120 (S.D.N.Y.1987); *Dynamic Solutions, Inc. v. Planning & Control, Inc.,* 646 F.Supp. 1329 (S.D.N.Y.1986); *Alart Assocs. Inc. v. Aptaker,* 279 F.Supp. 268 (S.D.N.Y.1968), *appeal dismissed,* 402 F.2d 779 (2d Cir.1968).

We are aware that most of the cases applying a fraud or prejudice standard, and permitting infringement actions despite inaccuracies in registration, involve defects in original registration certificates rather than in renewals. Original registrations can be changed at any time during the original term of copyright, while, as discussed earlier, certain errors in the renewal registration of pre–1964 works, such as the Book, could only be corrected in the last year of the original term. 17 U.S.C. § 304(a)(1983); 37 C.F.R. § 201.5(b)(2)(iv)(1983). However, the reasoning of these cases does not turn on whether or not correction is possible. Indeed, in this circuit, a lead decision applying the fraud or prejudice standard, contains language strongly implying that this standard should apply across the board, regardless of whether the applicable statutes or regulations permit corrections. *See Harris, supra,* at 1335 (rejecting defendant's contention that the work had entered into the public domain because of inaccuracies in the copyright registration, and noting that the 1909 Copyright Act did not contain a statutory or regulatory scheme providing opportunity for correction of mistakes in copyright registrations).

These cases generally do not require perfection, but instead base their analyses on principles of fair and non-formalistic administration of the copyright laws. *See, e.g., Huk-a–Poo Sportswear, Inc. v. Little Lisa, Ltd.,* 74 F.R.D. 621 (S.D.N.Y.1977) ("This court is mindful of the policy that courts seek to preserve copyrights rather than invalidate them on the basis of minor defects in registration certificates."); *Craft, supra,* at 125 (even though the copyright owner had not claimed "work for hire" on the certificate of registration, the court noted that "if the facts sustain his position and if it appears that the misstatement was inadvertent, little turns on the error; the copyright is not thereby invalidated, nor is the certificate of registration rendered incapable of supporting the action").

Maaherra argues that the Foundation's claim is nevertheless barred even under the holdings of these cases because the Foundation intended to defraud the Copyright Office when it stated it was the "proprietor of a work made for hire." *See Dynamic Solutions, supra,* at 1341 ("Errors on the registration application do not affect plaintiff's right to sue for infringement unless they are knowing and might have caused the Copyright Office to reject the application.") Maaherra asserts that the Foundation did not want to reveal to the Copyright Office that the "authors" were celestial beings because the Copyright Office would have rejected the application.

There is no merit to this contention. The Foundation deposited two copies of the Book with the Copyright Office. The Book clearly describes its own origin as having been created at the instance of: "Planetary celestial

supervisors [who initiated] those petitions that resulted in the granting of the mandates making possible the series of revelations of which this presentation is a part." We conclude that there has been no fraud on the Foundation's part, and no prejudicial reliance on Maaherra's part.

We therefore hold that the Foundation's renewal copyright is valid, and that Maaherra infringed it.

For the foregoing reasons, the decision of the district court is REVERSED and the case REMANDED for further proceedings on damages.